**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ALBERT VAN LUIT & COMPANY, Respondent.**

No. 78–2114.

United States Court of Appeals, Ninth Circuit.

May 24, 1979.

Elliott Moore, Deputy Assoc. Gen. Counsel, Washington, D. C., for petitioner.

Stephen F. Harbison, Los Angeles, Cal., for respondent.

Before BROWNING and CHOY, Circuit Judges, and EAST,* District Judge.

PER CURIAM:

The Petitioner (Board) seeks, pursuant to 29 U.S.C. § 160(e), enforcement of its Supplemental Decision and Order of February 28, 1978, reported at 234 NLRB No. 30, 97 LRRM 1464. The Supplemental Decision and Order affirmed, with insignificant modification, the Administrative Law Judge's (ALJ) Decision of May 19, 1977, 229 NLRB 811.

We note jurisdiction and enforce.

FACTS:

On January 23, 1975, Southern California Printing Specialties & Paper Products Union, District Council # 2, AFL–CIO (the Union) was certified to represent the employees of Albert Van Luit & Company (the Company). On June 29, 1975, the Company and the Union entered into a bargaining agreement, effective until June 28, 1977. The agreement contains a standard union-security clause, requiring unit employees to become members of the Union within 30 days of commencement of employment and to maintain their membership in good standing. The agreement also includes a dues checkoff provision directing the Company, upon receipt of a signed authorization from an employee, to deduct dues from the employee's wages and remit the dues to the Union. The agreement provides that checkoff authorizations are to be irrevocable for one year and are to renew automatically unless the employee gives written notice to the Company and to the Union "not more than twenty (20) days and not less than ten (10) days prior to the expiration of each period of one (1) year or of each applicable collective bargaining agreement . . . ."[1]

On April 16, 1976, a petition was filed by employees requesting a union-security deauthorization election. On May 28, the employees voted 76 for deauthorization and 58 against. The Union filed objections, which were overruled, and the Regional Director certified the election results on August 31, 1976. The Union's appeal was denied on October 5.

On June 10 and 11, 1976, after the election but before certification, plant manager Robert Adams followed along as paychecks were distributed and gave each employee a blank checkoff revocation form, purporting to revoke authorization as of May 28, 1976, the date of the election. In addition, Adams distributed an explanatory document which read:

"To All Bargaining Unit Employees:

"Many of you have asked what effect the Union Deauthorization vote on May 28, 1976, will have on the withholding of Union dues and fees from your paychecks. As you know, you voted 76 to 58 to revoke the Union's authority to require that membership in the Union be required of all employees.

"Our attorneys have advised us that we should withhold dues and fees for the Month of May, 1976 from your June 11, 1976, checks. We will hold these fees and dues until it can be determined whether we must pay them to the Union or whether we can refund them to you.

"The Union has delayed certification of the results of the Union Deauthorization election by filing Objections to the Conduct of the Election. Once the election is certified, we will be in a better position to determine whether the dues and fees for May must be paid to the Union or whether we can refund them to you.

"In the meantime, our attorneys have advised us that we should also withhold dues and fees for the month of June, unless individual employees express their desire to revoke the check-off 'authorization' earlier signed by them.

"Accordingly, if you desire that the Company stop withholding Union dues and

---

* Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

1. The Company has not argued that the revocations were valid under the terms of the agreement.

fees from your paychecks, you may sign and date the attached Revocation and give it to your Supervisor or to the payroll department. You should then contact the Union to determine what else should be done if you want to resign from the Union or otherwise terminate your individual obligation to pay dues and fees.

"If you want the Company to continue to withhold dues and fees, do nothing.

"If you want to have the Company stop withholding dues and fees, sign the attached Revocation and give it to the Company, or otherwise clearly express your intention to do so to the Company, preferably in writing."

In answer to employee questions, Adams testified that he uniformly responded: "If you want us to continue withholding, do nothing; if you want us to stop, sign a revocation form."

Approximately 106 employees signed the forms and returned them to the Company. The Company withheld as usual on the June 10–11 payday, because that was when May dues were paid. Starting in July, covering June dues, the Company ceased deducting for those employees who had returned the revocation forms. Although the Company customarily remitted the withholdings promptly, it did not remit the June 10–11 withholdings to the Union until October 1. In addition, subsequent withholdings from the wages of employees who did not revoke their authorizations were not remitted until November 9. The Company justified this delay in a letter to the Union explaining that it was keeping the funds in a separate bank account and waiting for the final determination of the election certification issues so that employees would be able to decide if they wanted to terminate their checkoff authorizations retroactive to the date of the election "unfettered by the union's assertion that they cannot do so."

The Union filed a charge on June 15, 1976 and the case was tried on November 9. Based upon the findings summarized above, the ALJ concluded:

1. By soliciting invalid checkoff revocations from its employees, the Company violated § 8(a)(1) of the National Labor Relations Act (the Act).
2. By discriminatorily refusing to withhold checkoff moneys from employees who had submitted invalid revocations, while withholding from those who had not, the Company violated § 8(a)(3) and (1) of the Act.
3. By unilaterally repudiating the checkoff provisions of its bargaining agreement with the Union, the Company violated § 8(a)(5) and (1) of the Act.
4. These unfair labor practices affect commerce within § 2(6) and (7) of the Act.

The Company was ordered to cease and desist from its unlawful conduct, to honor the contract checkoff provisions and the valid dues checkoff authorizations, and to remit to the Union the dues it should have checked off.

"Because a close legal and policy question" was raised, the Board decided to reconsider the decision. On February 28, 1978, it decided to adhere to the ALJ's decision.

ISSUE:

Whether the Board properly determined that the Company violated § 8(a)(1), (3), and (5) of the Act (29 U.S.C. § 158) by soliciting and honoring revocations of employees' union dues checkoff authorizations after an affirmative vote to rescind the authority of the Union but before certification of the election results, and by failing to remit to the Union checkoff moneys it did collect.

DISCUSSION:

Section 9(e)(1) of the Act, 29 U.S.C. § 159(e)(1) provides:

"Upon the filing with the Board, by 30 per centum or more of the employees in a bargaining unit covered by an agreement between their employer and a labor organization made pursuant to section 158(a)(3) of this title, of a petition alleging they desire that such authority be rescinded, the Board shall take a secret

ballot of the employees in such unit and certify the results thereof to such labor organization and to the employer."

Section 8(a)(3) states:

"[N]othing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization . . to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment . . . (ii) unless following an election held as provided in section 159(e) of this title within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement . . . ."

Although nothing in the Act specifically describes the effect of an affirmative deauthorization vote on an existing union-security agreement, several Board cases have dealt with the subject. Since there is no factual dispute in the present case, the conflict between the Board and the Company involves their interpretations of the Board's policy as expressed in those cases. None of the cases directly concerns the validity of revocations of checkoff authorizations which occurred between the date of the union deauthorization election and the date of a delayed certification of the election results.

In *Penn Cork & Closures, Inc.,* 156 NLRB 411 (1965), the Board held that it was a violation of § 8(a)(1) and (2) to continue to deduct dues after an affirmative union deauthorization vote, and after the employees had resigned from the union and revoked their checkoff authorizations. The Board stated:

"[W]hen there has been an affirmative deauthorization vote, outstanding checkoff authorizations originally executed while a union-security provision is in effect become vulnerable to revocation regardless of their terms." *Id.* at 414.

Certification of the election results in *Penn Cork,* however, occurred a mere ten days after the election and before the revocations, so the Board did not have to reach the question of whether the election or the certification triggered the employee's right to revoke checkoff authorization despite the terms of the agreement. Nevertheless, the Company relies on the statement in *Penn Cork* that "deauthorization under Section 9(e)(1) is immediately effective," 156 NLRB at 415, to show that the election itself immediately relieves employees of their obligation under the union-security clause, thereby freeing them to revoke their checkoff authorizations.

Using similar reasoning, the Company cites *Great Atlantic and Pacific Tea Company,* 100 NLRB 1494, 1497 (1952), in which the Board held that election results should be given immediate effect, rejecting the argument that the effect should be delayed until termination of the existing contract:

"Only by holding that an affirmative deauthorization vote immediately relieves employees of the obligations imposed by an existing union-security agreement can this Board give effect to the basic congressional objective . . . of not imposing a union-security agreement upon an unwilling majority."

*Monsanto Chemical Co.,* 147 NLRB 49, 51 (1964), and *Andor Co.,* 119 NLRB 925 (1957), affirmed the reasoning of *Great Atlantic & Pacific Tea Co.* that a union-security clause does not survive until the contract runs out after an affirmative union deauthorization vote. In none of these cases was the potential delay in implementing the will of the majority dependent upon certification of the election results.

In *Bedford Can Mfg. Co.,* 162 NLRB 1428 (1967), the employer was held to have unlawfully deducted dues after valid revocations of checkoff authorizations were filed on the same day as certification of the deauthorization election results.

Because certification proceeded the revocations in the above cases, the Board was not compelled by the facts of those cases to expressly state the rule adopted by the ALJ

in the present case: "The date the union-security provision becomes inoperative . . . is not the literal date of the election, but rather that on which the certification of results issues." Nevertheless, there is abundant language in those prior cases to support the ALJ's holding.

In *Penn Cork,* the Board stated: "The deauthorization election, however, had the effect, when certified by the Regional Director, of immediately suspending the union-shop provision of the contract." 156 NLRB at 414. In *Andor,* 119 NLRB at 929, the Board said "the effectiveness of the union-security clause in the contract between the Union and the Employer shall be suspended immediately upon certification of the results of the election to the Union and to the Employer." Likewise in *Monsanto*:

"[I]f the employees in this proceeding cast an affirmative deauthorization vote, it shall be taken to mean that the effectiveness of the agency-shop provisions in the contract between the Union and the Employer shall be suspended immediately upon certification to the Union and the Employer of the results of the election." 147 NLRB at 51.

And footnote 2 in *Bedford,* 162 NLRB at 1432, says: "[A] contract union-security provision is not fully suspended until the affirmative result of the deauthorization election is certified by the Regional Director . . . ."

Moreover, in a decision consistent with and subsequent to the Board's ruling in the present case, the Board allowed a union to enforce its union-security clause despite an election in which a second union won the right to replace it as representative of the employees. *Trico Products Corp.,* 238 NLRB 184, 99 LRRM 1473 (1978). The Board stated unequivocally: "The well-established rule concerning election results is that they are not effective until certification." 99 LRRM at 1474.

The strongest support for the Company comes from *Lyons Apparel, Inc.,* 218 NLRB 1172 (1975). Lyons was concerned with "whether a labor organization can require a new employee, after employees have voted

to rescind a union-security clause, to pay initiation fees and monthly membership dues pursuant thereto during the pendency of the union's objections to the deauthorization election." *Id.* at 1173. Because certification of the deauthorization election was delayed almost five months, the Board felt that:

"It would be unconscionable to permit the Union to exact from new employees initiation fees and dues during a period when *prima facie* the employees have withdrawn the Union's right to a union-security clause. If the General Counsel's and Union's position were accepted, a union could, by filing objections to a deauthorization election, delay the issuance of a certification of results and thus enrich itself during the interval at the expense of employees." 218 NLRB at 1173.

The Company argues that its longer-term employees are entitled to the benefits of their election, like the new employees were in *Lyons,* and that the Union will be able to enrich itself in the same way in this case as in *Lyons.* The ALJ, however, characterized *Lyons* as a narrow exception with a limited holding "that a union may not require a new employee to join and pay initiation fees and dues during the period between the affirmative deauthorization vote and the certification of the results of the election." 218 NLRB at 1173. The Board, in its Supplemental Decision and Order, agreed with that characterization and discussed why the equities which compelled the result in *Lyons* were absent in this case. This analysis conforms to that in *Trico,* in which the Board said that *Lyons*:

"represents an isolated exception to the general rule . . . and is not applicable here. No new employees were forced to pay initiation fees or dues to the . . . Union as a condition of employment. Employees were only required to maintain the payment of dues in return for the continued representation by the . . . Union on their behalf." 99 LRRM at 1474 n.5.

The Company argues that its solicitation of revocations was equivalent to the con-

duct of employers approved by the Board in *Cyclops Corp.*, 216 NLRB 857 (1975); *Perkins Machine Co.*, 141 NLRB 697 (1963); and *Tennesco Corp.*, 206 NLRB 48 (1973). In those cases, the employers informed employees of their rights under the bargaining agreement. The Company claims that it "acted neutrally in responding to questions posed by the employees" and that the Board erred in concluding that the Company violated § 8(a)(3) and (1) or § 8(a)(5) and (1).

The ALJ, however, determined that the revocations submitted before certification on August 31 were of no legal effect. Solicitation of invalid revocations, therefore, "intruded into the relationship between the unit employees and their bargaining representative in a manner . . . violative of Section 8(a)(1)." 229 NLRB at 813.[2] The Company's "repudiation of the checkoff provisions of the agreement, by honoring those revocations and by failing to make prompt remittance of the checkoff moneys it did collect, constituted unilateral changes violating Section 8(a)(5) and (1)." *Id.* A deauthorization vote does not automatically eliminate an employer's contractual obligation under a checkoff provision. An employer may not cease deducting dues unless the employees revoke their authorization. *W. P. Ihrie & Sons*, 165 NLRB 167 (1967). Therefore, by recognizing the invalid revocations, the Company, in effect, was unilaterally repudiating the checkoff provisions of the agreement.

Finally, the ALJ concluded that the Company discriminated against its employees, in violation of § 8(a)(3) and (1), "by withholding checkoff moneys from some but not from others (those who had submitted the void revocations) based upon a legally invalid classification." 229 NLRB at 813.

■ All of the above conclusions logically follow from a determination that the revocations were ineffective between the dates of their execution following the election and the Board's certification of the results of the election. That determination is supported by the language of prior NLRB cases[3] and of §§ 9(e)(1) and 8(a)(3)(ii) of the Act.

While we might conclude otherwise on the factual issue of whether the Company solicited the employees' revocations belatedly considered by the ALJ and the Board to be legally ineffective, such is not our function because the scope of our review under § 10(e) is limited:

"If the findings of the National Labor Relations Board are supported by substantial evidence on the record considered as a whole, they are conclusive; and so long as the Board did not misapply the law, the order is to be affirmed." *NLRB v. Heath Tec Division/San Francisco*, 566 F.2d 1367, 1369 (9th Cir. 1978), *cert. denied*, ── U.S. ──, 99 S.Ct. 110, 58 L.Ed.2d 127 (1978).

Our search of the evidentiary record reveals that the findings of the ALJ and the Board on that factual issue is supported by substantial evidence.

The Supreme Court has held that "where the Board has acted properly within its designated sphere, the court is required to grant enforcement of the Board's order." *NLRB v. Warren Co.*, 350 U.S. 107, 112, 76 S.Ct. 185, 188, 100 L.Ed. 96 (1955). "Congress has invested the Board, not the courts, with broad discretion to order a violator 'to take such affirmative action . . . as will effectuate the policies of [the Act]' 29 U.S.C. § 160(c) . . . ." *NLRB v. Food Stores Employees*, 417 U.S. 1, 8, 94 S.Ct. 2074, 2079, 40 L.Ed.2d 612 (1973).

■ Neither the ALJ nor the Board reached the glaring open issue of whether the employees signed revocations became automatically valid following the Board's

2. In *Shen-Mar Food Products, Inc.*, 221 NLRB 1329 (1976), an employer was held in violation of § 8(a)(1) for relying on an untimely revocation and failing to deduct and remit dues, though there was no deauthorization election in that case.

3. Of course, the Board is not strictly bound by its prior cases, though it does have a duty to explain departures from established agency policy. *Atchison, Topeka & Santa Fe Railway Co. v. Wichita Board of Trade*, 412 U.S. 800, 808, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973).

certification of the deauthorization election. Nor can we reach that issue in these proceedings. Resolution of that open issue, unfortunately, must be postponed until first met by the Board in compliance proceedings against the Company.[4] *Great Chinese American Sewing Co. v. NLRB*, 578 F.2d 251, 255–56 (9th Cir. 1978). In determining whether the Board's certification of the election results automatically validates the checkoff revocations, great weight should be accorded the clear, albeit premature, expression of the employees' wishes. If the equities in this repudiation of a union situation are held by any party, they certainly are in the hands of the employees.

The Board's Supplemental Decision and Order of February 28, 1978 is enforced.

ENFORCED.

---

**4.** These proceedings have been lodged with the Board and this Court for more than three years. The loss of administrative and judicial efforts without a final resolution is most regrettable.