**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**UNITED STATES POSTAL SERVICE and American Postal Workers Union, Respondents.**

**No. 86–6035.**

United States Court of Appeals, Sixth Circuit.

Argued Sept. 22, 1987.

Decided Nov. 18, 1987.

Aileen A. Armstrong, Deputy Associate General Counsel, Karen Cordry (argued), N.L.R.B., Washington, D.C., Barbara A. Atkin, John Burgoyne, John F. Ferguson, Emil C. Farkas, Director, N.L.R.B. Cincinnati, Ohio, for petitioner.

Arthur Luby (argued), O'Donnell, Schwartz, Anderson, Washington, D.C., Stephen Alpern (argued), Associate General Counsel, U.S. Postal Service, Washington, D.C., Jesse L. Butler, for respondents.

Before KENNEDY and KRUPANSKY, Circuit Judges, and BROWN, Senior Circuit Judge.

CORNELIA G. KENNEDY, Circuit Judge.

■ The National Labor Relations Board (the Board) seeks enforcement of its order that the United States Postal Service (the Postal Service) committed an unfair labor practice when it refused to immediately stop deducting dues as requested by the charging parties after they resigned from the American Postal Workers Union (the union). The Postal Service and the union contend that the dues authorization signed by the charging parties is irrevocable for one year. We agree and deny enforcement.[1]

---

1. The Board also seeks enforcement of its order finding that the union, but not the Postal Service, committed an unfair labor practice by refusing to allow the complaining parties (two individual postal workers) to resign from the union. The union does not contest this aspect of the decision. The Board is therefore entitled to summary enforcement.

The facts of this case are essentially uncontested. The Postal Service and the union are parties to a collective bargaining agreement, which covered the two charging parties, William Huber and Bert Franklin, postal workers in Cincinnati. The agreement allows the Postal Service to deduct union dues from the salaries of employees, if the employees execute an authorization. Neither membership in the union nor payment of dues may be a requirement of employment in the Postal Service. The authorization form, as allowed by the Postal Reorganization Act, 39 U.S.C. § 1205, provided that the deduction authorization would be irrevocable for one year, and would automatically be renewed for an additional year unless revoked during a ten-day period at the end of each yearly period.

Huber and Franklin executed such an authorization when they joined the union. Later, they sought to resign from the union and, although they were not within the permissible "window," they asked the Postal Service to stop deducting dues from their pay. The Postal Service refused, and the union continued to accept the money thus withheld.

The employees then charged that these acts constituted unfair labor practices, in violation of Section 8(a)(1), 8(a)(3), and 8(b)(1)(A) of the National Labor Relations Act (NLRA).[2] An Administrative Law Judge (ALJ) found that the union had violated the charging parties' rights by refusing to honor their requests to resign from the union, but that neither the Postal Service nor the union had violated the NLRA by continuing to withhold dues.

This second aspect of the ALJ's decision was reversed by the Board, which held that "Huber's and Franklin's dues-checkoff authorizations ... were revoked by operation of law when they resigned their union membership." Joint Appendix at 249. The Board did not set forth its reasoning but rather incorporated by reference its discussion in an essentially identical case, *Postal Service*, 279 N.L.R.B. 8, *enforcement denied sub nom. NLRB v. U.S. Postal Service*, 827 F.2d 548 (9th Cir.1987) (*Dalton*),[3] decided by the Board after the ALJ decided the present case.

▮ Ordinarily, the decisions of the Board are entitled to substantial deference from a reviewing court, which will uphold the Board's interpretation of the Labor Act if its decision is reasonable, *see Pattern Makers v. NLRB*, 473 U.S. 95, 105 S.Ct. 3064, 87 L.Ed.2d 68 (1985). While in this case the Board's decision rests on its interpretation of the Postal Reorganization Act (PRA), the experience and expertise of the Board extend beyond the NLRA to other statutes involving labor-management relations, and the PRA specifically assigns to the Board some of the responsibilities that the Board exercises under the NLRA, *see, e.g.*, 39 U.S.C. § 1202 (Board to select appropriate bargaining units), 39 U.S.C. § 1204 (Board to conduct elections). But in this case, and the cases on which it relies, the Board has failed to consider the provisions of the PRA. It is difficult to accord deference to the Board's interpretation under these circumstances.[4] As the Supreme Court explained:

In view of the Ninth Circuit's disposition in *NLRB v. U.S. Postal Service*, 827 F.2d 548 (9th Cir.1987) (*Dalton*), see discussion *infra* p. 1198–99, the Board now urges this Court to remand the present case to it "for reconsideration and further articulation of its rationale," Supp.Brief of NLRB at 2. Since we hold that the Postal Reorganization Act authorizes the conduct that the Board forbade, we see no point in remanding for further "articulation" of the Board's contract rationale.

2. 29 U.S.C. §§ 158(a)(1), 158(a)(3), 158(b)(1)(A).

3. Dalton was the name of the charging party. We use this name to avoid confusion.

4. Indeed, the Postal Service argues that deference is due to *its* interpretation of the PRA, citing *National Association of Postal Supervisors v. U.S. Postal Service*, 602 F.2d 420, 439 (D.C.Cir. 1979), which does defer to the Postal Service "in the construction of its governing statute," and does so in the context of labor-management relations. The resolution of this case does not, however, require resolution of to which body deference is due. Nonetheless, it is relevant that the Postal Service interprets a provision, about which it might be expected to be neutral or hostile to the position of the union, in the way that it does. The position of the Postal Service may be seen as an indication of the legitimacy of its interest in avoiding the admin-

The interpretation put on the statute by the agency charged with administering it is entitled to deference ... but the courts are the final authorities on issues of statutory construction. They must reject administrative constructions of the statute, whether reached by adjudication or by rulemaking, that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement.

*Federal Election Comm'n v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 31–32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981) (citations omitted). On this basis, the Board's construction of the PRA "cannot withstand scrutiny," *Dalton,* 827 F.2d at 555 (Fletcher, J., concurring).[5]

■ The Postal Reorganization Act made employee-management relations subject to the provisions of the NLRA "to the extent not inconsistent with provisions of" the Postal law, 39 U.S.C. § 1209. The extent to which any aspect of the NLRA applies to the Postal Service therefore necessarily requires an interpretation of the PRA. It is only if the NLRA provision is consistent with the PRA—for which the language of the PRA, its legislative history, and its underlying policy are the interpretative tools—that the Board's interpretation of the NLRA becomes relevant. Even if it is true, as the Board contends, that Congress wanted labor relations in the Postal Service to become as much like that in private industry as possible, the application of that principle to any particular situation must be sustained by reference to the PRA.

Since the Board referenced *Dalton* as the basis for its decision here, we turn to what it said there:

the PRA does *not* mandate that checkoff authorizations are irrevocable per se for 1 year irrespective of the nature of the contractual obligation undertaken by the employee executing the authorization.[3] Thus, the provisions of the PRA are not inconsistent with well-established Board principles recognizing that a dues-checkoff authorization that by its terms makes payment of dues a quid pro quo for union membership is revocable by operation of law upon effective resignation from union membership. Stated otherwise, Section 1205 of the PRA in no way alters or is inconsistent with the notion under the Act that, in determining the obligations of the parties pursuant to the voluntary execution of a dues-checkoff authorization, it is appropriate to focus upon the nature of the obligation actually incurred in the checkoff authorization.

279 N.L.R.B. at 7–8 (emphasis in original).

Footnote 3, indicated in the quotation, reads: "The revocability provisions of the PRA essentially are in line with the revocability provisions of Sec. 302(c)(4) of the [Labor] Act which privilege voluntary dues-checkoff assignments and render them lawful as permissible payments to employee representatives."

In effect, then, the Board in *Dalton* simply relied on its interpretation of the NLRA, with a footnote explaining that the applicable provisions of the PRA "are essentially in line" with the Labor Act's similar provisions. The Board brushed aside contentions that the differing language of the two laws was of any significance, and that the legislative history indicated any Congressional intention contrary to the Board's view. And it simply assumed that since Congress intended to "privatize" labor relations in the former Post Office, it

istrative problems that the Board's interpretation would entail.

5. This is the appeal of the case on which the Board relied in the present case. The decision of the Ninth Circuit in which "[a]ny factual differences between the two cases ... are of no legal significance whatever in resolving the issue presented in both cases," *United States v. Stauffer Chemical Co.,* 464 U.S. 165, 172, 104 S.Ct. 575, 579, 78 L.Ed.2d 388 (1984), raises the

possibility of issue preclusion or collateral estoppel. However the nature of an estoppel against the government is sufficiently different from an estoppel concerning private litigants so that it would be inappropriate here, *see United States v. Mendoza,* 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984). In addition, the individual postal workers in each case may be the real parties in interest and the question of estoppel has not been raised or briefed by the parties.

intended the provisions of the PRA to be interpreted identically to similar provisions of the NLRA, despite the great differences in the overall scheme of labor management relations which the PRA embodies. Each of these positions will be examined in turn.

The language of the two laws is similar, but crucially different. Section 302(c)(4) of the NLRA provides that an authorization "shall not be irrevocable for a period of more than one year." 29 U.S.C. § 186(c)(4). The provision allows, but does not require, an authorization to be irrevocable, and it places a maximum on the length of permissible irrevocability. The PRA, in contrast, provides that the Postal Service will deduct dues from the pay of employees who have made "a written assignment which *shall be irrevocable* for a period of not more than one year." 39 U.S.C. § 1205(a) (emphasis added).[6] On its face, section 1205 requires that any assignment made must be irrevocable for a period up to a year.[7]

The Board itself never considered this difference; that in itself may be sufficient to render its decision indefensible. General Counsel says that this "minor difference does not affect the evident thrust of both Sections," Petitioner's Brief at 17, and that "nothing in the legislative history … warrants a different conclusion.... Because of Section 1205's similarity to Section 302(c)(4) and the absence of any clarifying information, it is reasonable to infer that the draftsman of Section 1205 simply used Section 302(c)(4) as a model and intended Section 1205 to have the same meaning." *Id.* at 18. There are two things wrong with this analysis. First, the leap from "similarity" to "same" is unjustified; the *difference* in language is simply ignored. Second, it puts the cart before the horse: "the starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to

the contrary, that language must ordinarily be regarded as conclusive." *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980).

There is no such "clearly expressed" Congressional intent. The Ninth Circuit majority described the legislative history of section 1205(a) as "meager," *Dalton*, 827 F.2d at 552, and this seems accurate. This history is not inconsistent with the Board's interpretation of the provision. However, the legislative history is also entirely consistent with the plain language of section 1205(a) which may therefore be regarded as conclusive.

Finally, in deciding that section 1205 was effectively identical to section 302(c)(4), the Board failed to consider the significant differences that Congress intended for labor relations in the Postal Service from labor relations in the private sector. For example, the PRA bars strikes, and mandates arbitration, 39 U.S.C. § 1207, while the right to strike is a cornerstone of the Congressional scheme under the NLRA, 29 U.S.C. § 163. And with specific reference to the issues in this case, the PRA does not allow any "union security" provisions to be negotiated, 39 U.S.C. § 1209(c), whereas negotiation of a contract that requires, as a condition of employment, the payment to a union of an amount equivalent to dues is specifically permitted by the NLRA, 29 U.S.C. § 158(a)(3). The prohibition of union security clauses in the Postal Service makes the irrevocability provision of section 1205 the only way the union can accurately predict its future income and the level of services it can provide.

Most significant, the PRA, in the sections that are the subject of this and the *Dalton* case, explicitly permits the deduction of dues in situations that would unquestionably be illegal under the NLRA. Section 1205(b) of the PRA allows the continuation

---

**6.** The same language is contained in § 1205(b), discussed below, which provides for dues deductions in circumstances which would be illegal under the NLRA.

**7.** It is true that § 1205 speaks of authorization of "dues" by "members." But "in context, the

words … simply refer to the employee's status at the time of authorization and to the purpose for which the employee authorized the withholding of funds," *Dalton*, 827 F.2d at 556 n. 2 (Fletcher, J., concurring).

of existing dues deduction agreements with organizations that are not exclusive bargaining representatives. *See U.S. Postal Service,* 248 N.L.R.B. 5 (1980).[8] And section 1205(a), the provision that the Board must construe here, allows dues deductions for organizations of employees—supervisory personnel—who are not permitted to bargain collectively. Such a checkoff agreement would be outside the jurisdiction of the Board.[9] These are unmistakable indications that the dues checkoff provisions of the PRA were not intended to be identical to those of the NLRA.

In view of these differences, the Board's reasoning in *Dalton,* and therefore in this case, is unpersuasive, since it relies exclusively on the Board's interpretation of the NLRA. In *Dalton,* the Board says it is following *Machinists Local 2045 (Eagle Signal),* 268 N.L.R.B. 635 (1984). That case, in turn, relies on two others: *Steelworkers, Local 7450 (Asarco Inc.),* 246 N.L.R.B. 881 (1979) and *Carpenters Council (Campbell Industries),* 243 N.L.R.B. 147 (1979). It is only this last case that actually contains the Board's reasoning, which is essentially an analysis based on contract principles: "the parties agreed to checkoff on the express understanding that union membership with its attendant benefits furnished consideration therefore," *id.* at 149 n. 9. *Campbell Industries* laid great stress on the express language of the dues authorization agreement, which included a recitation that the dues were " 'in consideration of the benefits received and to be received by me as a result of my membership in the Union,' " *id.* at 149. This *"quid pro quo"* analysis was contrasted with the result in *Frito–Lay, Inc.,* 243 N.L.R.B. 137 (1979) where the Board sustained the legality of limiting revocation to specified periods.

■ As a matter of contract law, even if the authorization includes an implied or express condition that it is in consideration for the benefits of union membership, the Board's analysis is unsustainable. A party to a contract may not relieve himself of the obligation to perform by indicating that he no longer desires the other party's performance. So long as the other party remains ready to perform, both sides are bound. Huber and Franklin voluntarily chose to resign from the union; the union, so far as the record indicates, remained ready to tender them the benefits of union membership, which was the consideration for which, on the Board's analysis, they had bargained.[10] It is because the Board based its decision entirely "on an erroneous view of the requirements of contract law" that the Ninth Circuit majority held that "the Board has not given a reasoned basis for its rule, nor does it represent a correct application of the law." *Dalton,* 827 F.2d at 554–55.

General Counsel relies on *NLRB v. Penn Cork & Closures, Inc.,* 376 F.2d 52 (2d Cir.) (Friendly, J.), *cert. denied,* 389 U.S. 843, 88 S.Ct. 89, 19 L.Ed.2d 109 (1967) for the proposition that "a dues deduction authorization valid at the time of execution, which provides for revocation only at certain stated time periods, may nonetheless become invalid as the result of subsequent events." Petitioner's Brief at 11. The question, of course, is *what* subsequent events will make it invalid. In *Penn Cork,* employees rescinded the legal authorization for the union security clause through a Board election specifically provided for under section 9(e)(1)[11] of the NLRA. Since it was reasonable to suppose that the employees had only authorized the checkoff because the payment of dues had been a condition of employment, the cancellation of the dues

---

**8.** In that case, the Board indicated that it could, when necessary, attempt to interpret the provisions of the PRA.

**9.** This is an additional cause to doubt that Congress intended the Board to administer this section of the PRA.

**10.** Since there is no indication that the union was not prepared to perform, it is irrelevant

whether the checkoff authorization—the contract—contained an express or implied condition that the dues checkoff was a *quid pro quo* for union membership, and there is therefore no need for a close examination of the wording of the authorization in this case.

**11.** 29 U.S.C. § 159(e)(1).

authorization after the vote seemed the only way to carry out Congress' evident intention in providing for such an election. *Penn Cork* is thus based on an analysis of the limitations that the labor laws and labor policy place on traditional contract doctrine. The reasoning of *Penn Cork* does not support the position of General Counsel. As Judge Friendly said: "it would be hard to see how continued enforcement of the checkoff after purported revocation would be an unfair labor practice" when there is a checkoff agreement without a union security clause, 376 F.2d at 55. This case presents exactly such a situation. The employees voluntarily signed the checkoff authorization, knowing it was irrevocable except at stated intervals. They did not sign it because the payment of dues was required to keep their jobs. It is, indeed, "hard to see" how this could be an unfair labor practice.[12]

■ General Counsel also attempts to argue that the Board's decision is supported by the Supreme Court's holding in *Pattern Makers v. NLRB*, 473 U.S. 95, 105 S.Ct. 3064, 87 L.Ed.2d 68 (1985). The Board did not rely on the reasoning of *Pattern Makers* in making its decision. "[A] reviewing court ... must judge the propriety of [the actions of an administrative agency] solely by the grounds invoked by the agency." *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947). A court will not affirm the administrative action by substituting "a more adequate or proper basis," *id.* This Court will not affirm the Board's actions based on reasons not relied upon by the Board itself.

Even if the Board had relied on *Pattern Makers*, that reliance would have been misplaced. First, *Pattern Makers* involved the interplay of two sections of the NLRA, and the Court gave deference to the Board's resolution of the conflict between them. The Court's opinion makes it very clear that it is based on deference to the Board's interpretation of the NLRA, *id.* 473 U.S. at 116, 105 S.Ct. at 3076 ("We defer to the Board's interpretation of the Act and so affirm"); *id.* at 117, 105 S.Ct. at 3077 (White, J. concurring) ("were the Board arguing for [the contrary] interpretation of the Act, I would accord its view appropriate deference").[13] We do not believe the Board's interpretation of the PRA is entitled to this degree of deference.

Second, as a substantive matter, *Pattern Makers* does not apply to this situation. *Pattern Makers* held that a union could not use monetary fines to burden a member's right to resign. The fines were imposed on employees who returned to work during a strike. Since refraining from concerted activity (the strike) is a protected right, imposing fines for returning to work restrained the exercise of that right. The Congressional policy of voluntary unionism was the underlying rationale of the decision, *id.* at 107, 105 S.Ct. at 3071. In the present case, there is nothing that restrains Huber and Franklin from leaving the union. They are not being punished for their actions; they are not required to pay a greater amount if they leave the union. General Counsel is asking this Court to extend the holding of *Pattern Makers* far beyond its rationale, and does so in a case where the Board did not mention the Supreme Court's holding.

**The Jurisdictional Issue:** At oral argument, the jurisdiction of this Court to consider respondents' contention that the Board misconstrued the PRA was questioned because of respondents' failure to file cross-exceptions before the Board. The parties were requested to file letter briefs on this issue.

Our jurisdiction is conferred by Section 10(e) of the NLRA, 29 U.S.C. § 160(e), which specifies that "[n]o objection that has not been urged before the Board, its member, agent, or agency, shall be con-

---

12. General Counsel also cites *NLRB v. Albert Van Luit & Co.*, 597 F.2d 681 (9th Cir.1979). *Van Luit* also concerned a § 9(e)(1) deauthorization election, and held it was an unfair labor practice for the employer to solicit untimely revocations. *Van Luit* does not support the Board's position.

13. Justice White was the fifth vote for the majority in *Pattern Makers*.

sidered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."

■ General Counsel maintains that although both the Postal Service and the union raised the statutory construction argument to the ALJ, they failed to preserve it for review by this Court by raising it before the Board through cross-exceptions. General Counsel argues that the filing of exceptions and cross-exceptions is the only means by which an objection can be "urged before the Board" sufficiently to preserve it for judicial review. The Board's regulations provide that "[n]o matter not included in exceptions or cross-exceptions may thereafter be argued before the Board, or in any further proceeding," 29 C.F.R. § 102.46(h). General Counsel concedes that the Postal Service and union briefs to the ALJ—which discussed the statutory argument—were refiled with the Board. More importantly, General Counsel's own brief in support of her exceptions raised the statutory issue:

> The Postal Reorganization Act contains a similar provision. The Postal Reorganization Act does not refer to one year period in successive years.... The Postal Reorganization Act does not override the policy of the Board.

Joint Appendix at 244–45.

We reject the Board's argument and hold that the issue of the interpretation of the PRA was "urged before the Board" and was a matter "included in exceptions" and that in reaching its decision the Board necessarily took into consideration the directly applicable provisions of the PRA.

The Board relies on *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665–66, 102 S.Ct. 2071, 2082–83, 72 L.Ed.2d 398 (1982), a case in which the Board decided an issue that neither party had raised before the Board. The Court held that since there had been no objection to the Board's decision on this issue in the form of a petition for rehearing or reconsideration, the Court of Appeals was without jurisdiction to consider the question. However, in *Woelke*, unlike here, the Board had

decided two independent *issues:* Whether a particular type of contract clause was made legal by section 8(e) of the NLRA, and whether picketing to obtain such a legal clause was a violation of section 8(b)(4)(A) of the NLRA. It was this second issue that had never been raised before the Board, either before or after it made its decision.

We do not believe the prohibition of *Woelke* is applicable here. This Court is not being asked to consider a separate issue that was never urged upon the Board. Rather, we are being asked to review the Board's ruling that a particular practice is illegal, a ruling that was vigorously disputed by the parties before the Board. We hold that the practice is not illegal, and in doing so we necessarily consider the applicable law.

General Counsel also relies upon *Southern Moldings, Inc. v. NLRB*, 728 F.2d 805 (6th Cir.1984) (*en banc*), in which we applied *Woelke*. But that case, like *Woelke*, involved an independent issue that had never been raised before the Board. *Southern Moldings* concerned both the substantive question of whether the employer had committed an unfair labor practice, and the separate question of whether the Board was required to make explicit findings respecting the remedy it chose. The latter issue was raised, for the first time, before this Court, and we held that *Woelke* foreclosed our deciding it. Once again, it was not a question of two legal *theories* to support the same issue, but of two entirely different issues.

Two recent decisions of this Court support our conclusion that we have jurisdiction. In *NLRB v. Watson–Rummell Electric Co.*, 815 F.2d 29 (6th Cir.1987), after considering *Woelke*, we held that section 10(e) did not preclude us from deciding whether an employer's special status as a construction industry contractor brought the employer under the special provisions of section 8(f)—despite the fact that the issue had not been specifically raised before the Board. The "specificity required for a claim to escape the bar imposed by § 10(e) is that which will 'apprise the Board

of an intention to bring up the question,'" *id.* at 31, (quoting *May Department Stores v. NLRB*, 326 U.S. 376, 386 n. 5, 66 S.Ct. 203, 209 n. 5, 90 L.Ed. 145 (1945)). The Court held that the ALJ's decision and the arguments before the Board were sufficient to require the Board itself to inquire if the employer was covered by section 8(f).

Again in *NLRB v. Edward Cooper Painting, Inc.*, 804 F.2d 934 (6th Cir.1986), we held that the fact that the "Board was cognizant of [a] pending bankruptcy proceeding and determined that its proceeding was excepted from the automatic stay," *id.* at 943, meant that the Board had "therefore disregarded respondent's plea in abatement," *id.*, and this was sufficient to satisfy section 10(e). Thus the employer's argument that his discharge in bankruptcy barred enforcement of the Board's order was reviewable by this Court, although it had not been directly presented to the Board.

These cases are consistent with the long line of Supreme Court decisions that make it clear that the main function of section 10(e) is to allow the Board to consider an issue in the first instance. *See Marshall Field & Co. v. NLRB*, 318 U.S. 253, 255, 63 S.Ct. 585, 586, 87 L.Ed. 744 (1943); *May Dep't Stores v. NLRB*, 326 U.S. 376, 386 n. 5, 66 S.Ct. 203, 209 n. 5, 90 L.Ed. 145. General Counsel concedes that the purpose of section 10(e) is to insure that "the Board is entitled to be apprised of all material contested issues at the time it reviews the administrative law judge's decision," Supp. Brief of NLRB at 4.

Section 10(e) serves, first of all, to insure that "all controversies of fact, and the allowable inferences from the facts, be threshed out, certainly in the first instance, before the Board. That is what the Board is for." *NLRB v. Cheney Cal. Lumber Co.*, 327 U.S. 385, 389, 66 S.Ct. 553, 555, 90 L.Ed. 739 (1946). Where the claimed errors are legal, the requirements of section 10(e) permit the Board to more fully address the issue, thereby bringing its expertise to bear on the resolution of the issue. *See EEOC v. FLRA*, 476 U.S. 19, 106 S.Ct. 1678, 90 L.Ed.2d 19 (1986).

Here the Board was aware of the need to interpret the PRA in this case, the parties had urged this position on the Board, and the matter was referred to in the exceptions. We conclude that this Court has jurisdiction.

Accordingly, the order is enforced insofar as it finds that the union committed an unfair labor practice by refusing to allow the complaining parties to resign from the union. In all other respects enforcement is denied.