**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 19a0427n.06
Nos. 18-2108/2225

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Aug 16, 2019
DEBORAH S. HUNT, Clerk

MARATHON PETROLEUM CO., LP, d/b/a )
Catlettsburg Refining, LLC, )
          )
    **Petitioner/Cross-Respondent,** )
          )
v. )
          )
NATIONAL LABOR RELATIONS BOARD, )
          )
    **Respondent/Cross-Petitioner.** )
          )

ON PETTION FOR REVIEW
AND CROSS-APPLICATION
FOR ENFORCEMENT OF AN
ORDER OF THE NATIONAL
LABOR RELATIONS BOARD

OPINION

Before: MOORE, COOK, and THAPAR, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** Marathon Petroleum Co., LP ("the Company") entered into a new collective bargaining agreement ("CBA") with Local 8-719 ("the Union") of the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO (United Steelworkers) ("the International Union") in 2015. The parties also signed a Letter Agreement providing that they would meet to discuss the possibility of the Company reassigning to the Union maintenance work that was being performed by subcontractors. When the Union requested detailed subcontracting cost information from the Company pursuant to the Letter Agreement and the Company refused to furnish it, the Union charged the Company with violating § 8(a)(5) and (1) of the National Labor Relations Act ("the Act"). The Administrative Law Judge ("ALJ") and then the National Labor Relations Board ("the Board") held that the Company violated the Act. The Company now petitions for review of

the Board's order, and the NLRB cross-petitions for enforcement of that order. We deny enforcement of the Board's order and remand to the Board so that it may determine in the first instance whether the Company had a duty to bargain with the Union.

## I. BACKGROUND

### A. Negotiating the CBA and Letter Agreement

The Company operates an oil refinery in Catlettsburg, Kentucky. It has recognized the Union as the exclusive bargaining representative for 391 of the Company's 743 employees at the refinery. A at 7.[1] The Company is a member of a multiemployer bargaining association that negotiates the National Oil Bargaining Policy ("NOBP" or "Pattern Agreement") with the International Union. The Pattern Agreement prescribes a framework for CBAs between the member employers and the corresponding local unions.

Upon the expiration of the 2012–2015 CBA, the International Union began a strike on February 1, 2015. The strike was motivated in part by disputes over subcontracting; the Union wished to return to the bargaining unit routine maintenance work that had been subcontracted out. A at 7. The International Union and the multiemployer bargaining association arrived at a new Pattern Agreement on March 12, 2015. Following the adoption of the new Pattern Agreement, the Union and the Company entered into a new agreement for the Catlettsburg site, incorporating the new Pattern Agreement's terms on April 1, 2015. The strike ended when the bargaining unit ratified the agreement on April 3, 2015.

---

[1]We follow the parties' citing conventions, using "A" to refer to the Appendix filed by the Company and "SA" to refer to the Supplemental Appendix filed by the NLRB. Citations to "R." refer to the documents from the certified list of the contents of the agency record filed by the NLRB.

The new agreement's Article 20, which covers "contract work," contains provisions pertaining to the Company's abilities and obligations in balancing contractor and employee work but is only "applicable in the event of an involuntary layoff of employee(s)." A at 115. The new agreement also incorporated a Letter Agreement regarding "maintenance training and development" ("the Letter Agreement"). It states:

> The Parties agree to meet upon request by the local union or management to discuss ongoing opportunities in the area of maintenance recruitment, development and day-to-day routine maintenance craft needs. These initial discussions shall be concluded within one hundred and eighty (180) days of the date of ratification.

A at 54. The Letter Agreement continues:

> [T]he Parties will meet within the same specified time period above to discuss . . . [c]ollaborative ways in which bargaining unit craft training and development could be enhanced [and] [*w*]*ays in which day-to-day routine maintenance work currently performed by contractors could be efficiently performed by bargaining unit employees*[.] At the conclusion of such discussions, the Company will develop and share the projected maintenance hiring plans and timelines for implementing such plans with the Local Union . . . .

*Id.* (emphasis added). The Letter Agreement further notes that "[t]he information relevant to this discussion may be considered confidential and proprietary, and may require the signing of a Confidentiality Agreement." A at 55. It continues: "Nothing in the above should be construed as constituting minimum staffing levels. It is understood that any hiring of maintenance employees will be based on business and facility maintenance needs as determined by the company." *Id.*

**B. Interactions pursuant to the Letter Agreement**

On April 8, 2015, the Union requested a meeting with the Company to discuss the implementation of the Letter Agreement. SA at 20–21, 143. On April 20, 2015, the Company

agreed to meet. SA at 144. On May 21, 2015, the Union submitted to the Company requests for nine different categories of information. A at 82–83. The second request stated: "Provide the wage/roll up/overhead costs of [full-time contractor maintenance employees working within the Refinery and/or Chemical Plant]. Include any premiums and margins paid to the contractor firms and any bonus/completion milestones paid to them." *Id.* at 83. Roll-up cost is the "breakdown of all of the costs that go into a billable rate" and "would include the base wage rate that are [sic] paid to the employee[,] . . . fringe benefits, workers' comp, Social Security, federal unemployment insurance, state unemployment insurance, overhead for the contractor, and profit for the overhead—profit for the company." SA at 121–22, 124 (James Nelson Tr.).

On August 6, 2015, the Union and the Company signed a confidentiality agreement to govern the Company's disclosure of information in response to the Union's May 21 requests. A at 84–87. The following day, the Company responded to the Union's requests. In response to the second request, seeking "wage/roll up/overhead costs" for contractor maintenance employees, the Company stated:

> We do not understand the relevance of this request; please explain. Contracting supplemental workers is a means to expand and contract our workforce to meet the cyclical nature of our business, and the costs do not alter the Company's need to maintain that operational flexibility. In addition, this request involves highly sensitive, confidential information involving the Company's business relationships with third parties. Disclosing such information could damage the Company's ability to reach agreements with these third parties.

A at 88.

Representatives from the Union and the Company met on August 13, 2015. They discussed, among other subjects, "ways in which day-to-day routine maintenance work currently

4

performed by contractors could efficiently [be] performed by bargaining union employees." SA at 92–93, 102 (Gregory Jackson Tr.). Gregory Jackson, Human Resources Manager for the refinery, testified that he "asked Alan Sampson of the Union to go back and start looking at identifying . . . those ways," and Sampson asked Jackson to do the same. *Id.* at 102–03. Jackson testified that he told Sampson: "'If we weren't doing it efficiently now, we would have already changed that.' So we—we are, in our minds, doing it efficiently, based on the way we were staffed." *Id.* at 103.

Union and Company representatives met again on September 14, 2015. SA at 28. The parties discussed how "routine maintenance jobs might be returned to the Union." *Id.* at 29. Roy Claar, Recording Secretary for the Union, testified that he told Jackson that bargaining unit employees could do the work more efficiently than contractors, but that the Union "need[ed] those contractor rates to prove that [it could] do the work more efficiently." SA at 14–15, 31 (Claar Tr.). Claar testified that Mark Estep, Maintenance Manager at the Company, stated "We can't give that to you." *Id.* at 31. Claar responded that the Union had signed a confidentiality agreement with the Company. *Id.* at 146. The Union presented Jackson with a list of maintenance jobs that the Union believed it could perform more efficiently than contractors could. *Id.* at 34.

Soon after that meeting, Claar emailed Jackson to reiterate the Union's request for wage/roll-up/overhead expenses for maintenance contractors. *Id.* at 35. The Company responded in a letter dated October 5, 2015, reasserting its position that it contracted with supplemental employees to accommodate fluctuating workflow, and that accordingly "the costs [of employing contractors] do not alter the Company's need to maintain that operational flexibility." A at 93.

The Company stated that the Union had not met its "burden of establishing relevance when requesting non-bargaining unit data, including subcontracting costs," and asserted that "cont[r]acting costs are only relevant if the union can show that the employer justifies contracting on the basis of cost." *Id.* (emphasis in original). Accordingly, the Company refused to provide the information, although it stated that it would "reconsider the request" if the Union "provide[d] information" consistent with the Company's understanding of the Union's obligations. *Id.* at 94.

On January 8, 2016, representatives from the Union and the Company met again. The Company presented the Union with a summary chart titled "Contractor Billable Rate and MPC Equivalent Position Burden Rate: 2015 CRLLC," which it claimed was responsive to the Union's information request. A at 92; SA at 75–78. The chart purported to provide a comparison of the weighted average billable rates for paying bargaining unit employees versus contractors in six different positions: laborer, millwright, crane operator, pipe fitter, carpenter, and electrician. A at 92; SA at 39, 78. It was not accompanied by any supporting documentation.

The Union informed the Company that the chart did not satisfy its information request because it did not sufficiently break down the various inputs to allow the Union to perform a true comparison. SA at 40, 77–78. The Union also took issue with the fact that the chart did not include figures for instrument techs or mechanics. The Company did not offer additional information in response to the Union's complaints. *Id.* at 78–79. The Company cited confidentiality concerns in explaining its decision to withhold more detailed information; it did not want to jeopardize its relationships with the third parties with whom it contracted.

**C.  Dispute before the Board**

The Union filed a charge against the Company on October 26, 2015.  A at 6.  On February 25, 2016, the NLRB's General Counsel filed a Complaint and Notice of Hearing against the Company, claiming that the Company had violated § 8(a)(5) and (1) of the Act by failing and refusing to respond to the Union's request for information relevant to the Union's performance of its duties in collective bargaining.  A at 43.

> The Company filed an answer to the complaint.  In paragraph seven, it stated:

> The collectively-bargained agreement between Marathon and the Union representing its Maintenance employees unequivocally permits the use of independent contractors and employees thereof to perform services on behalf of Marathon, and said agreement remains in place through its expiration date of January 31, 2019. *The information sought by the Union which is the subject of this Complaint bears no relationship to negotiation over mandatory terms or conditions of employment.*

R. 10-3 (Answer to Compl. at 2) (Page ID #151) (emphasis added).  Paragraph eight stated:

> The information sought by the Union . . . is not relevant to any outstanding grievance initiated or pursued by the Union arising under the terms of the existing collectively-bargained agreement or any ancillary agreement, and is therefore irrelevant in matters which might otherwise pertain to administration or enforcement of such agreement.

*Id.*

A hearing was held before an ALJ on April 26, 2016.  A at 6.  In its opening argument, the Company stated that there was "nothing in the negotiating history of these parties, certainly no grievance, nothing in the collective bargaining agreement that requires or imposes any limitations upon subcontracting routine maintenance work by Marathon."  A at 174–75.  At the hearing, Jackson testified that the Letter Agreement "sort of kicked the can down the road a little bit on this

7

maintenance staffing agreement. So there wasn't any real teeth in this to do, other than let's meet and discuss—not negotiate necessarily." *Id.* at 158. In its post-hearing brief, the Company argued that it was not required to furnish subcontracting information because "[n]othing in the record of this case suggests a grievance-based or contract negotiation nexus to the information sought by the [union]" and because the CBA reserved the Company the right to subcontract. *Id.* at 23. The Company's arguments at the hearing and in its briefing focused primarily on claims: (1) that the information requested was not relevant because the Company based its decision to use subcontractors not on cost, but rather on workforce flexibility, and (2) that the Company had made a good-faith effort to compromise and accommodate the information request in the face of its confidentiality concerns.

The ALJ determined that the Company had violated the Act and issued an order requiring the Company to provide the requested information to the Union. A at 6–15. The ALJ's decision repeatedly substituted the word "bargain" for the Letter Agreement's words "meet . . . to discuss." It contained no analysis explaining why it was appropriate to equate meeting to discuss with bargaining. A at 6–15. The parties each filed exceptions to the decision and accompanying briefs. The Company's exceptions and brief highlighted the ALJ's insertion of the word "bargain" where it did not occur in either the Letter Agreement or the exchanges between the parties. A at 25–34.

The Board affirmed and adopted the ALJ's decision. A at 5. In its lengthy footnote one, however, the Board noted that Chairman Ring believed that "the employer may not have an obligation to provide requested information regarding the costs of subcontracting, absent evidence that the employer had actual or constructive notice of some other basis for the request" where

> (i) the parties' collective-bargaining agreement reserved to the employer the right to subcontract routine maintenance work unilaterally and thus waived the union's right to bargain over the subcontracting of such work, (ii) the parties also had a side agreement to engage in mid-term discussions—not bargaining—regarding ways to preserve routine maintenance work for unit employees, and (iii) the side agreement reiterated the contractual bargaining waiver by providing that the transfer of contracted-out maintenance work to unit employees remained within the employer's sole discretion.

A at 5 n.1. Chairman Ring concluded, however, that "no such argument was raised to the administrative law judge in this case" and therefore declined to address it. *Id.*

In the same footnote, the other two Members of the Board responded to Chairman Ring's analysis concerning the potential lack of a duty to bargain. They stated:

> Contrary to the Chairman, we do not agree that the facts he describes, or anything in the side agreement itself, would amount to a waiver [of a bargaining right] even had such an argument been properly raised to the judge. We also find no merit to his suggestion that the side agreement's requirement to meet and discuss the preservation of bargaining unit work may not give rise to a bargaining obligation.

*Id.*

The Company timely filed a petition for review of the Board's order, and the NLRB cross-petitioned for enforcement.

## II. DISCUSSION

### A. Standard of Review

We uphold the Board's findings of fact and application of the law to facts "if they are supported by substantial evidence on the record as a whole." *E. Tenn. Baptist Hosp. v. NLRB*, 6 F.3d 1139, 1143 (6th Cir. 1993). We review the Board's legal conclusions de novo. *Harborside Healthcare, Inc. v. NLRB*, 230 F.3d 206, 208 (6th Cir. 2000). "In reviewing the NLRB's

interpretation of the Act, this Court is deferential to the Board's interpretation. So long as the [Board's] interpretation of the statute is 'reasonably defensible,' this Court will not disturb such interpretation." *Vanguard Fire & Supply Co. v. NLRB*, 468 F.3d 952, 957 (6th Cir. 2006) (citations omitted). We, however, must "set aside Board decisions which rest on an erroneous legal foundation." *E. Tenn. Baptist Hosp.*, 6 F.3d at 1143 (quoting *NLRB v. Brown*, 380 U.S. 278, 292 (1965)) (quotation marks omitted).

## B. Duty to bargain over subcontracting

The Company argues that it had no duty to bargain over the contents of the Letter Agreement, which it believes created only an obligation to meet to discuss. Because there was no duty to bargain on this subject, the Company asserts, there was no corresponding duty to accommodate the Union's requests for information that would facilitate bargaining. Reply Br. at 4; *FirstEnergy Generation, LLC v. NLRB*, 929 F.3d 321, 334 (6th Cir. 2019) (determining that where one party "did not have a duty to bargain over subcontracting . . ., it had no duty to provide the Union with information regarding the wages and material costs"); *NLRB v. Truitt Mfg. Co.*, 351 U.S. 149, 151–54 (1956) (concluding that the duty to bargain in good faith may require a party to disclose information pertinent to the bargaining subject).

At oral argument, the NLRB conceded that if there were no duty to bargain on subcontracting, the claim against the Company would fail. The NLRB, however, argues that § 10(e) of the Act prevents us from reaching this argument because "the Company failed to object

before the Board to the Board's finding that the Company had waived that argument."[2]  NLRB Br. at 41.  The NLRB claims that to preserve appellate jurisdiction, the Company had to file a petition for reconsideration or rehearing with the Board in which it should have argued that the Board had incorrectly concluded that the Company had not presented the no-duty-to-bargain argument to the ALJ.  *Id.*  In other words, the NLRB claims that the Company forfeited its challenge to the Board's finding of forfeiture.

Section 10(e) of the Act provides that "[n]o objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."  29 U.S.C. § 160(e).  We have stated that "[t]he 'specificity required for a claim to escape the bar imposed by § 10(e) is that which will "apprise the Board of an intention to bring up the question."'"  *NLRB v. U.S. Postal Serv.*, 833 F.2d 1195, 1202–03 (6th Cir. 1987) (quoting *NLRB v. Watson-Rummell Elec. Co.*, 815 F.2d 29, 31 (6th Cir. 1987)).  This is because "[s]ection 10(e) serves, first of all, to insure that 'all controversies of fact, and the allowable inferences from the facts, be threshed out, certainly in the first instance, before the Board.'"  *Id.* at 1203 (quoting *NLRB v. Cheney Cal. Lumber Co.*, 327 U.S. 385, 389 (1946)).  "Where the claimed errors are legal, the requirements of section 10(e) permit the Board to more fully address the issue, thereby bringing its expertise to bear on the resolution of the issue."  *Id.*

---

[2]Although the NLRB uses the term "waive," it actually describes a potential forfeiture.  *See United States v. Olano*, 507 U.S. 725, 733 (1993) (outlining the difference between waiver and forfeiture).

We conclude that the no-duty-to-bargain argument was adequately preserved such that we have jurisdiction to consider it. First, the Company laid the groundwork for the argument before the ALJ in four different places: (1) its answer to the complaint, R. 10-3 (Answer to Compl. at 2), (2) its opening argument, A at 174–75, (3) testimony at the hearing, *id.* at 158, and (4) its post-hearing brief, *id.* at 23. Although the Company could have made the argument much more explicitly before the ALJ, it did assert its legal foundations. Second, the Company satisfied § 10(e)'s requirement of "appris[ing] the Board of an intention to bring up the question" in its exceptions to the ALJ's decision and brief before the Board. *Watson-Rummell*, 815 F.2d at 31 (quoting *May Dep't Stores Co. v. NLRB*, 326 U.S. 376, 386–87 n.5 (1945)); A at 25–34 ("The first question before the Board is whether the NOBP gave rise to an obligation on the part of Marathon to bargain over ways in which routine maintenance work, currently performed by contractors, could be efficiently performed by bargaining unit employees. Marathon contends that, per the express terms of the NOBP, Marathon was only obligated to 'discuss' the return of routine maintenance work to unit employees."). The Company sufficiently raised the lack of a duty to bargain to "permit the Board to more fully address the issue, thereby bringing its expertise to bear on the resolution of the issue." *U.S. Postal Serv.*, 833 F.2d at 1203. As we discuss below in explaining our decision to remand, the Board simply did not take advantage of that opportunity.

We reject the NLRB's argument that in order to preserve appellate jurisdiction over the no-duty-to-bargain question, the Company was required to file a petition for rehearing or reconsideration with the Board, disputing the Board's purported finding that the Company had failed to raise the argument before the ALJ. The NLRB advocates an unduly strict interpretation

of § 10(e)'s jurisdictional bar by overreading *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645 (1982).

As an initial matter, it appears that the Board's decision did not turn on Chairman Ring's assessment that the no-duty-to-bargain argument had not been raised before the ALJ. *See* A at 5 n.1. The two other Members never explicitly concluded that the argument had not been raised to the ALJ, nor do they seem to have rested their decision on the Company's purported failure to raise it. Instead, they used alternative phrasing, stating that they would have affirmed the ALJ's decision even had the argument had been raised to the ALJ. *Id.* The Company need not have moved for rehearing or reconsideration of a conclusion that was not necessary to the Board's decision.

Next, even if Board's decision had turned on the conclusion that the Company had not raised the no-duty-to-bargain argument before the ALJ, the Supreme Court's interpretation of § 10(e) in *Woelke* would not deprive us of jurisdiction. In *Woelke*, the Supreme Court concluded that § 10(e)'s jurisdictional bar prevented the federal courts from considering a party's challenge to the Board's sua sponte determination of a substantive legal issue because neither party "raised [the issue] during the proceedings before the Board" and the party failed to petition the Board for reconsideration or rehearing of that holding prior to challenging it in federal court. 456 U.S. at 665–66. *Woelke* does not require a party to file a motion for reconsideration or rehearing when the Board rejects an argument *presented* by the parties, even when the rejection is based on forfeiture. *See U.S. Postal Serv.*, 833 F.2d at 1202 (concluding that *Woelke* was inapplicable where we were "not being asked to consider a separate issue that was never urged upon the Board"); *see*

*also Watson-Rummell*, 815 F.2d at 31 (determining that the Sixth Circuit had jurisdiction to consider the employer's argument that it was exempt under a specific provision, where before the Board the employer had "consistently and vigorously contested any contractual duties" in a manner that "suggest[ed] strongly" that the exemption applied and "should have prompted the Board to inquire further into [its] applicability"). Section 10(e) does not preclude us from considering the no-duty-to-bargain argument.

Having jurisdiction over the no-duty-to-bargain issue, however, does not mean that we are well situated to decide it. We have previously remanded to the Board to determine "the applicability . . . and effect" of certain legal distinctions that "the Board should have considered" even where we have had appellate jurisdiction over the question. *Watson-Rummell*, 815 F.2d at 31–32; *see also Ford Motor Co. v. NLRB*, 305 U.S. 364, 373 (1939) ("It is familiar appellate practice to remand causes for further proceedings without deciding the merits, where justice demands that course in order that some defect in the record may be supplied. Such a remand may be made to permit further evidence to be taken or additional findings to be made upon essential points." (footnotes omitted)).

We remand to the Board to decide whether the Company had a duty to bargain over subcontracting under the CBA and Letter Agreement, the key question driving the merits of this case. We find insufficient the Board's cursory and opaque discussion of the duty to bargain and any potential waiver of a bargaining right in a single footnote. We believe that the Company's exceptions and supporting brief "should have prompted the Board to inquire further" about whether a duty to bargain existed and to explain its conclusions on that subject. *Watson-Rummell*,

14

815 F.2d at 31.  Remand is also appropriate because answering the legal question of whether a duty to bargain existed may require the finding of facts beyond those determined by the ALJ.  *See NLRB v. Glass*, 317 F.2d 726, 727 (6th Cir. 1963) (remanding "to the Board for the taking of further proofs").  For example, the ALJ's decision makes no mention whatsoever of the CBA's Article 20, upon which the Company asks us to draw the legal conclusion that it had no duty to bargain.

Finally, because the parties' arguments concerning the relevance of the information requested by the Union and the adequacy of the Company's compromise efforts assume a duty to bargain, we do not reach them here.

### III.  CONCLUSION

We deny enforcement of the Board's order and remand to the Board for additional proceedings as outlined above.