*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0309p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

TEMP-MASTERS, INC.,
　　　　　　　*Petitioner/Cross-Respondent,*

　　　*v.*

NATIONAL LABOR RELATIONS BOARD,
　　　　　　　*Respondent/Cross-Petitioner.*

Nos. 05-2079/2272

>

On Petition for Review and Cross-Application for Enforcement
of an Order of the National Labor Relations Board.
No. 9-CA-40822.

Argued: June 2, 2006

Decided and Filed: July 17, 2006[*]

Before: BATCHELDER, GIBBONS, and COOK, Circuit Judges.

_____

## COUNSEL

**ARGUED:** David W. Miller, BAKER & DANIELS, Fort Wayne, Indiana, for Petitioner. Jason Walta, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent. **ON BRIEF:** Thomas R. Biehl, Jr., BAKER & DANIELS, Fort Wayne, Indiana, Todd M. Nierman, BAKER & DANIELS, Indianapolis, Indiana, for Petitioner. Jason Walta, Aileen A. Armstrong, Julie B. Broido, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent.

_____

## OPINION

_____

　　　　JULIA SMITH GIBBONS, Circuit Judge. Petitioner Temp-Masters, Inc. ("Temp-Masters") seeks review of an order of the National Labor Relations Board ("NLRB" or "Board"), and the Board cross-petitions for enforcement of that order. In the order, the Board found that Temp-Masters violated Sections 8(a)(3) and (1) of the National Labor Relations Act ("NLRA" or "Act"), by transferring four of its employees from jobsites in the vicinity of Georgetown, Ohio, to a jobsite approximately 250 miles away, in retaliation for union activity that ultimately culminated in a petition for a union election. For the following reasons, we affirm the Board's order.

_____

[*]This decision was originally issued as an "unpublished decision" filed on July 17, 2006. On August 17, 2006, the court designated the opinion as one recommended for full-text publication.

I.

Temp-Masters, a construction business headquartered in Uniondale, Indiana, installs and services commercial refrigeration systems and heating, ventilation, and air conditioning ("HVAC") systems. Temp-Masters works on projects in six states: Illinois, Michigan, Kentucky, Iowa, Indiana, and Ohio. Temp-Masters typically has between twenty and thirty active installation projects, with each project usually lasting between three and twelve months. Between 2002 and 2004, Temp-Masters had two installation projects in the vicinity of Georgetown, Ohio. Temp-Masters contracted to install HVAC systems for the Brown County Engineer's maintenance and salt storage facilities (the "Brown County project") and an Ohio Highway Patrol post (the "OHP project") (collectively, the "Georgetown projects"). Both of the Georgetown projects were prevailing wage projects, which paid general laborers more than $34 per hour.

Beginning in March 2003, Steven Mitchell was the original supervisor of the Brown County project. In September 2003, Mitchell was moved to the OHP project, and Michael Fahy took over as supervisor for the Brown County project. Mark Pack, a project manager at Temp-Masters, managed the Georgetown projects. Pack reported to Gil Bardige, general manager, who in turn reported to company president Kenneth Powell. In addition to Mitchell and Fahy, Temp-Masters hired six other employees to work on the Georgetown projects: Michael Powell (the son of company president Kenneth Powell), Joseph Stapleton, Curtis Treaux, Matthew Wandstrat, Samuel Lunsford, and Paul DeVaux. As of December 1, 2003, these eight Temp-Masters's employees regularly worked on the Georgetown projects.

In November or early December 2003, Mitchell contacted Troy Wagner, a representative of the Sheet Metal Workers International Union, No. 24 (the "Union"), regarding the possibility of an organizing campaign for employees working on the Georgetown projects. Wagner gave union authorization cards to Mitchell and Wandstrat, who distributed them to Fahy, DeVaux, and Lunsford. Authorization cards were not given to Stapleton because of the perception that he was a friend of Pack (the project manager) or to Treaux because of his vocal opposition to the Union. Ultimately, Mitchell, Wandstrat, Fahy, DeVaux, and Lunsford all signed authorization cards.

On December 3, 2003, based on these employees' support, the Union filed a petition with the Board, seeking to represent a seven-person unit covering the Temp-Masters's sheet metal installation and fabrication workers in Ohio. On December 8, a management labor consultant informed Temp-Masters's president Kenneth Powell that the Union had filed this election petition with the Board. Between December 8 and December 12, Kenneth Powell called Pack and instructed him to tell Stapleton, DeVaux, and Lunsford to report to a jobsite in Danville, Illinois on the following Monday morning, December 15. Pack instructed these employees to do so on Friday afternoon. About one week later, on Sunday, December 21, Pack also instructed Wandstrat to report to the Danville jobsite the following day.

The Danville jobsite was approximately 250 miles from Georgetown, Ohio. Moreover, unlike the prevailing wage projects in Georgetown, the Danville job paid general laborers between $11 and $13 per hour. Temp-Masters had been installing refrigeration systems at the Danville site – a Shop Rite store – since August 2003. By mid-November, the lack of progress on the Danville site had become a source of frustration for the store's owner, Al Abbed, who was trying to open the store by Christmas. In mid-November, Abbed began complaining to Temp-Masters on an almost daily basis. Beginning in mid-November, Temp-Masters began to increase the hours spent on the Danville job. By the time Stapleton, DeVaux, Lunsford, and Wandstrat were ordered to transfer, however, work at the Danville site had begun to taper off.

Three of the four transferred employees were unable to travel to Danville. DeVaux informed Temp-Masters that he could not relocate because he was a single father and had no one to watch his

son. Stapleton told Temp-Masters that he could not relocate immediately to Danville because, as he had previously told the company, he needed to care for the estate of his recently deceased father. When Stapleton later told Powell that he would be unable to transfer to Danville, he was informed that there was no work for him in Georgetown. Wandstrat explained that he could not get to Danville because of the expenses entailed in relocation. Temp-Masters deemed DeVaux, Stapleton, and Wandstrat as having terminated their employment by refusing to accept assignment in Danville. Only Lunsford traveled to Danville, arriving on December 17. On December 18, Temp-Masters transferred several employees from the Brown County site to the OHP site. Those employees worked long days, including the day after Christmas, which was typically a holiday. Moreover, to make up for the shortages caused by the discharges of DeVaux, Stapleton, and Wandstrat, Temp-Masters added two new employees to work at the OHP site.

On April 30, 2004, the Board's general counsel issued a complaint against Temp-Masters, pursuant to an amended charge filed by the Union. The complaint alleged that Temp-Masters violated Sections 8(a)(3) and (1) of the Act by transferring the four employees and by terminating the three employees who refused to accept the transfers, in retaliation for union activity. The complaint further alleged that Temp-Masters violated Section 8(a)(1) of the Act by coercively interrogating an employee as to whether a union representative had met with employees. An administrative law judge ("ALJ") conducted a two-day hearing. The ALJ issued a recommended decision, finding all violations alleged in the complaint. Temp-Masters filed exceptions to the ALJ's decision. The Board adopted the ALJ's finding of a violation with respect to Temp-Masters's unlawful transfer and termination of its employees; however, the Board reversed the ALJ's finding of a violation based on unlawful interrogation and dismissed that portion of the complaint.

II.

We will uphold the Board's findings if supported by substantial evidence on the record as a whole. 29 U.S.C. § 160(e), (f). Substantial evidence is relevant evidence that "a reasonable mind might accept as adequate to support a conclusion." *Fluor Daniel, Inc. v. NLRB*, 332 F.3d 961, 967 (6th Cir. 2003). This court defers to the Board's reasonable interpretations of the NLRA but reviews any conclusions of law unrelated to the NLRA *de novo*. *Lee v. NLRB*, 325 F.3d 749, 754 (6th Cir. 2003).

Section 8(a)(3) of the Act makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). Section 8(a)(1) of the Act makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section [7]." 29 U.S.C. § 158(a)(1). Section 7, in turn, guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining." 29 U.S.C. § 157. A violation of Section 8(a)(3) of the Act produces a derivative violation of Section 8(a)(1). *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 698 n.4 (1983).

An employer generally commits an unfair labor practice under Sections 8(a)(1) and (3) "by making an employment decision that discourages union membership or interferes with an employee's right to organize." *Kamtech, Inc. v. NLRB*, 314 F.3d 800, 806 (6th Cir. 2002). "The threshold test for determining whether the employment decision constitutes an unfair labor practice is whether the decision was motivated by anti-union animus." *Id.* The Board bears the initial burden of showing, by a preponderance of the evidence, that the employer's decision was motivated by the employee's union activity. *Id.* at 807. The Board must show "that the employee's protected conduct was a motivating factor in the adverse action." *ITT Automotive v. NLRB*, 188 F.3d 375, 387 (6th Cir. 1999) (quoting *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 401 (1983)).

"Specifically, the general counsel must establish that (i) an individual was engaged in a protected activity, (ii) the employer was aware of the protected activity, and (iii) that the employee's protected activity motivated the adverse treatment." *Kentucky General, Inc. v. NLRB*, 177 F.3d 430, 435 (6th Cir. 1999).

Anti-union motivation may be inferred based on a variety of factors, including: the company's expressed hostility towards unionization together with knowledge of the employees' union activities; the proximity in time between the employees' union activities and the employment decision; the inconsistencies between the proffered reason for the employment decision and other actions of the employer; the company's deviation from past practices in implementing the employment decision; and any disparate treatment of certain employees compared to other employees with similar work records or offenses. *See Kentucky General*, 177 F.3d at 435-36; *W.F. Bolin Co. v. NLRB*, 70 F.3d 863, 871 (6th Cir. 1995). "Circumstantial evidence alone is sufficient to create an inference of anti-union animus on the part of an employer." *Kentucky General*, 177 F.3d at 436.

If the Board establishes that the union activity was a motivating factor in the employment decision, then "the burden of persuasion shifts to the employer to prove, again by a preponderance of the evidence, the affirmative defense that the same employment decision would have been made even in the absence of any protected labor activity." *Kamtech*, 314 F.3d at 807. This affirmative defense fails if the employer's proffered justification for the employment decision is determined to be pretextual. *W.F. Bolin*, 70 F.3d at 873.

Temp-Masters first argues that its transfer of Stapleton, DeVaux, Lunsford, and Wandstradt was not a sufficiently adverse employment decision to be considered an unfair labor practice under the Act, regardless of whether or not that employment decision was motivated by anti-union animus. The Board responds that Temp-Masters failed to preserve the issue of whether the employment decision was sufficiently adverse to be covered by the NLRA for appellate review.

Under Section 10(e) of the Act, this court may not consider an "objection that has not been urged before the Board, its member, agent, or agency." 29 U.S.C. § 160(e). The "specificity required for a claim to escape the bar imposed by § 10(e) is that which will 'apprise the Board of an intention to bring up the question.'" *NLRB v. United States Postal Serv.*, 833 F.2d 1195, 1202-03 (6th Cir. 1987) (quoting *May Dep't Stores v. NLRB*, 326 U.S. 376, 386 n.5 (1945)). Temp-Masters submitted to the Board ninety-seven objections to the ALJ's decision. Temp-Masters now claims that nine of its ninety-seven objections addressed the issue of whether the employment decision was sufficiently adverse to constitute an unfair labor practice. We disagree. The nine objections relied on by Temp-Masters constitute objections to the underlying factual findings that the ALJ made regarding the frequency of employee transfers and to the ALJ's legal conclusion that the transfers in this case evinced anti-union animus. We find no mention in these nine objections of the ALJ's legal conclusion that the transfer decisions were sufficiently adverse to constitute an unfair labor practice. In short, Temp-Masters did not "apprise the Board of [its] intention to bring up" its argument that the transfers were not sufficiently adverse to constitute an unfair labor practice notwithstanding employer motive. We are therefore without jurisdiction, pursuant to Section 10(e), to consider this issue on appeal.[1]

---

[1]Citing an unpublished Sixth Circuit opinion, Temp-Masters argues that, even if it failed to explicitly raise the issue before the Board, the issue is nevertheless preserved for review because it was a "necessarily considered" issue. *See NLRB v. Twin City Hosp. Corp.*, Nos. 92-5255/5375, 1993 WL 337562, at *2 (6th Cir. Aug. 31, 1993). In *Twin City*, this court stated, "Notably, if consideration of an issue becomes a necessary incident to a case before the Board, review of that issue will lie even in the absence of explicit argumentation." 1993 WL 337562, at *2 (citing *NLRB v. United States Postal Serv.*, 833 F.2d 1195, 1202-03 (6th Cir. 1987)). This court in *Twin City* misstated the law of *Postal Service*, which actually held that the Board had been adequately presented with an issue because the parties had argued the issue

Even if Temp-Masters preserved the issue for appeal, substantial evidence supports the Board's finding that Temp-Masters's transfers were sufficiently adverse to constitute unfair labor practices. Under the NLRA, it is clear that the transfers in this case were sufficiently "adverse" to be considered a covered employment decision. It is well settled that an employer may not transfer employees for the purpose of discouraging union activity. *See NLRB v. Seligman and Assoc., Inc.*, 808 F.2d 1155, 1160 (6th Cir. 1986); *NLRB v. White Superior Div., White Motor Company*, 404 F.2d 1100, 1102 (6th Cir. 1968). Moreover, the Georgetown projects were "prevailing wage" jobs that paid more than $34 per hour, while the Danville job paid only $11 to $13 per hour. Thus, even if transfer to a distant location is not itself sufficiently adverse under the NLRA, the transfers here would have resulted in actual monetary loss to the transferred employees. In short, the transfers, if designed to thwart union activity, are covered employment decisions.[2]

Temp-Masters next argues that the Board failed to show that its decision to transfer was motivated by hostility to union activity. Temp-Masters argues that the relative work demands of the jobsites and store owner Abbed's complaints dictated the transfers, which it claims were commonplace for Temp-Masters' employees. According to Temp-Masters, this legitimate business reason for the transfer either precludes a finding that it was motivated by anti-union animus or, in the alternative, establishes the affirmative defense that it would have transferred these employees even in the absence of any union activity. Moreover, according to Temp-Masters, no anti-union motivation can be inferred from its conduct because its own president is a former union member, the company welcomed union workers in Ohio, undertook no anti-union campaign after receiving notice of the Union's petition for election, and did not discharge or otherwise continue to harass employee Lunsford even though he had signed an authorization card.

Substantial evidence on the record as a whole supports the Board's finding that Temp-Masters's transfer decision was motivated by the employees' union activities. There is no dispute that Powell became aware of the employees' protected union conduct on December 8. If the election had been successful, Temp-Masters would have been required to enter into a collective bargaining agreement under Section 9(a) of the Act. No more than four days after becoming aware of the union petition, Powell ordered three members of the bargaining unit transferred. This direct involvement by Powell was unusual; he did not personally contact supervisors with regard to any other transfers to the Danville site. Moreover, although the record indicates that Temp-Masters does regularly transfer employees between jobsites, it had not transferred the locally-hired Georgetown employees to any other sites before learning of the protected activity. The Board concluded that the temporal proximity of the transfers to the protected activity, along with Powell's unusual direct involvement in the transfer decision, and the fact that these Georgetown employees had never been

---

to the ALJ and their briefs to the ALJ were refiled with the Board. *See Postal Serv.*, 833 F.2d at 1202. Additionally, this court in *Twin City* misquoted *Postal Service*. *Compare Twin City Hosp. Corp.*, 1993 WL 337562, at *2 (quoting *Postal Serv.* for proposition that Section 10(e) does not bar a "'necessarily consider[ed],' dependent issue") *with Postal Serv.*, 833 F.2d at 1202 ("We hold that the practice is not illegal, and in doing so *we necessarily consider* the applicable law." (emphasis added)). The notion that a necessary issue before the Board is, without more, always preserved for review is therefore without support in published precedent. Moreover, such a proposition would largely nullify Section 10(e).

[2]Temp-Masters does not cite any case concluding that an employer's decision to transfer an employee does not constitute a covered employment action under the NLRA when a finding of anti-union animus is present. Instead, Temp-Masters repeatedly cites cases interpreting employment discrimination statutes and uses the term "adverse employment action" as it is used in those cases. *See Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 886 (6th Cir. 1996) (interpreting ADA); *Timmons v. Boehringer Ingelheim Corp.*, 132 F. App'x 598, 599-600 (6th Cir. 2005) (interpreting ADEA and Title VII); *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996) (interpreting ADEA). Yet, Temp-Masters fails to point to any case that uses employment discrimination caselaw in this context to interpret the NLRA. We decline to engage in a comparison of the NLRA's requirement of a covered employment action and employment discrimination statutes' requirement of an adverse employment action, an exercise not pertinent to the issue here.

transferred before, was sufficient to establish that the transfers were motivated by anti-union animus. This finding is supported by substantial evidence.

Substantial evidence also supports the Board's rejection of Temp-Masters's claim that work demands dictated the transfer decisions. The Board decided that Temp-Masters's seemingly credible explanation for the transfer decision – namely, the dispute with Abbed – did not actually motivate the transfer. Although Abbed had complained extensively about the progress of the Danville project, the Board found that the urgency of the Danville job had passed before the transfers were ordered and that the need for labor on the Danville project was less at that time than that needed on the Georgetown projects. Indeed, the company payroll records show a spike in hours worked at the Danville site from early November until mid-December – *before* Lunsford, DeVaux, and Stapleton were transferred. Moreover, the work that Lunsford performed once arriving in Danville, only three days of work consisting largely of clean-up, belies Temp-Masters's claim of urgency. With respect to Wandstrat, his transfer is even more difficult to explain, because there was almost no work at the Danville site by the time he was ordered to transfer. Moreover, during the same time period, Temp-Masters's need for employees at the Georgetown projects actually increased.[3] The Board's determination that work demands did not motivate the transfers is supported by substantial evidence.

Temp-Masters also argues that some of its actions, irrespective of workload considerations, compel a finding that the transfers were not motivated by anti-union animus. Temp-Masters argues that Powell was a former union member and that Temp-Masters historically hired union workers. These facts have little relevance to the issue of whether these particular transfer decisions were motivated by anti-union animus. *See W.F. Bolin*, 70 F.3d at 871 (reasoning that an absence of "hostility towards unionization per se" cannot overcome an otherwise supported finding of anti-union motivation for the particular employment decision). Temp-Masters also claims that it undertook no anti-union campaign when it learned of the Union's petition for election. This claim ignores the fact that the decision to transfer the four employees and their subsequent inability to travel was, by itself, potentially sufficient to defeat any efforts to unionize. Therefore, no further action was required and the absence of such action is irrelevant. Likewise, Temp-Masters's argument that its retention of Lunsford is irrelevant in light of the fact that its dismissal of three employees meant that it was no longer faced with imminent unionization.

Temp-Masters also makes a number of legal arguments that are unavailing. Temp-Masters claims that the Board, in concluding that Temp-Masters acted out of anti-union animus, erroneously relied on its finding that Temp-Masters's asserted business reason for the transfers – work demands – was pretextual. Under the NLRA, the Board can – and indeed, should – examine the falsity of an asserted business justification when considering whether a discriminatory motive underlies the employment action. *See NLRB v. Gen. Fabrications Corp.*, 222 F.3d 218, 226-27 (6th Cir. 2000) (reasoning that falsity of employer's explanation for termination helped establish discriminatory motive); *W.F. Bolin*, 70 F.3d at 871 ("Discriminatory motivation may reasonably be inferred from . . . inconsistencies between the proffered reason for [the employment decision] and other actions of the employer"). Temp-Masters also implies that the Board erred by failing to consider *all* of the factors that may create an inference of discrimination. In determining whether discriminatory motivation exists, however, the Board may rely on a subset of the relevant factors and, often, not all factors will be present in a specific case. *See W.F. Bolin*, 70 F.3d at 871 (discussing how the presence of certain factors allows for a reasonable inference of discriminatory motivation notwithstanding the absence of other factors).

---

[3]At trial, Powell testified that the dispute with Abbed precipitated the transfers. Thus, although Temp-Masters now argues that the Board did not make any credibility determinations, the Board did find Powell's testimony incredible at least in part. Because credibility determinations are the province of the Board, we will not readily disturb its determination that Powell was not actually motivated by Abbed's calls. *See Kamtech*, 314 F.3d at 812; *Pikeville United Methodist Hosp. of Kentucky, Inc. v. NLRB*, 109 F.3d 1146, 1154 n.7 (6th Cir. 1997).

Temp-Masters next argues that the Board failed to credit its proffered reasons for the transfer, thereby substituting its own business judgment for that of the company. Contrary to Temp-Masters's contention, the Board clearly discredited Temp-Masters's proffered justification because it did not believe the justification to be truthful, not because it believed the justification to be truthful but nevertheless disagreed with the wisdom of it. *See Fluor Daniel*, 332 F.3d at 973. Finally, Temp-Masters claims that the Board failed to analyze whether its asserted business justification would have led it to take the same action absent the employees' efforts to unionize. The Board is not obligated to analyze whether Temp-Masters would have taken the same action in the absence of union activity – essentially, a balancing of mixed motives – after it establishes that the proffered reason for the transfer was disingenuous; at that point, there is nothing left to balance against the impermissible motive. *See Republic Die and Tool Co. v. NLRB*, 680 F.2d 463, 465 (6th Cir. 1982) (explaining the difference between a case of pretext and a true mixed-motive case requiring balancing of permissible and impermissible motives). In sum, the legal analysis undertaken by the Board and the analytical framework employed therein was not erroneous.

III.

For the foregoing reasons, we affirm the Board's order.