*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0121p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

Case No. 05-2259
CENTER CONSTRUCTION CO., INC., d/b/a CENTER
SERVICE SYSTEM DIVISION,

*Petitioner,*

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent,*

LOCAL 370, UNITED ASSOCIATION OF JOURNEYMEN
AND APPRENTICES OF THE PLUMBING AND
PIPEFITTING INDUSTRY OF THE UNITED STATES AND
CANADA, AFL-CIO,

*Intervenor.*

Case No. 05-2425
CENTER CONSTRUCTION CO., INC., d/b/a CENTER
SERVICE SYSTEM DIVISION,

*Petitioner/Cross-Respondent,*

v.

NATIONAL LABOR RELATIONS BOARD,

*Respondent/Cross-Petitioner.*

Case No. 05-2326
LOCAL 370, UNITED ASSOCIATION OF JOURNEYMEN
AND APPRENTICES OF THE PLUMBING AND
PIPEFITTING INDUSTRY OF THE UNITED STATES AND
CANADA, AFL-CIO,

*Petitioner,*

v.

NATIONAL LABOR RELATIONS BOARD,

*Respondent.*

Nos. 05-2259/2425/2326

On Petition for Review and Enforcement of an Order

1

of the National Labor Relations Board.
No. 7-CA-46490

Argued:  November 1, 2006

Decided and Filed:  April 3, 2007

Before:  MOORE, ROGERS, and GIBSON, Circuit Judges.[*]

————————

**COUNSEL**

**ARGUED:**  Hiram S. Grossman, DANIEL & GROSSMAN, Flint, Michigan, Tinamarie Pappas, Ann Arbor, Michigan, for Petitioner.  Jeffrey Barham, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent.  **ON BRIEF:**  Hiram S. Grossman, DANIEL & GROSSMAN, Flint, Michigan, Tinamarie Pappas, Ann Arbor, Michigan, for Petitioner.  Jeffrey Barham, Aileen A. Armstrong, David Habenstreit, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent.

GIBSON, J., delivered the opinion of the court, in which MOORE, J., joined.  ROGERS, J. (pp. 12-14), delivered a separate opinion concurring in part and dissenting in part.

————————

**OPINION**

————————

JOHN R. GIBSON, Circuit Judge.  Center Construction Co. petitions for review of the National Labor Relations Board's order finding Center committed numerous unfair labor practices to combat the organization of Center's two-man plumbing staff by Local 370 of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO.  Local 370 intervened to oppose Center's petition and also petitions for review of the one claim on which the Board reversed the ALJ, finding Center had not committed an unfair labor practice.  The Board cross-petitions for enforcement.  We deny Center's petition for review, grant Local 370's petition, and grant the Board's petition for enforcement except insofar as the Board held that Center had not committed an unfair labor practice in threatening the sheet metal workers with loss of jobs.

## I.  Facts.

Center Construction does mostly heating and air-conditioning, employing about twenty to forty HVAC (heating, ventilation, and air-conditioning) workers who are represented by the Sheet Metal Workers' Union, Local 7.  Plumbing is a small part of Center's business, and at the time of the events in this case, Center only employed two plumbers–a licensed plumber, Wayne Rose, and an apprentice plumber, Lance Lockhart.  The plumbers' union, Local 370, had tried to organize Center twice before, in 1994 and 1998, but had been defeated.  The owner and president of the business was Robert Eagleson.

---

[*] The Honorable John R. Gibson, Circuit Judge of the United States Court of Appeals for the Eighth Circuit Court of Appeals, sitting by designation.

In July 2003, Center's two plumbers, Rose and Lockhart, signed authorization cards and gave them to Local 370's organizer, Benjamin Ranger. On August 4, 2003, Ranger and Local 370's business manager, Mark Johnson, met with Center's owner, Robert Eagleson, presented him with the two cards, and asked him to recognize Local 370 as the representative of the bargaining unit. Ranger and Johnson said Eagleson took the cards and examined them for several minutes, but Eagleson said he could not recall taking the cards. Both Ranger and Johnson testified that Eagleson said that he would never recognize Local 370 and that he would go out of business first. Eagleson, on the other hand, recalled a very different conversation; he testified that what he said was: "I would never sign an agreement without seeing a Contract." Eagleson said he requested a copy of Local 370's existing collective bargaining contract.

The next day, Ranger sent Eagleson a letter that wrongly stated in the first line that Local 370 represented a majority of the HVAC technicians at Center, although the body of the letter requested bargaining on behalf of Center's plumbing employees only. The sheet metal workers' representative learned about the letter and called Ranger about it. As soon as Ranger found out about his mistake, he faxed a corrected letter to the sheet metal workers and to Center saying it was the plumbers he represented, not the HVAC workers. Ranger filed a petition for a representation election with the Board three days after his meeting with Eagleson. The petition stated that there were two employees in the bargaining unit.

**Picket Incident.** Within a day or two after presenting the cards to Eagleson, Local 370 began picketing Center. Lance Lockhart, Center's apprentice plumber, as well as a few other Center employees, participated in the picketing. The remaining Center employees refused to cross the picket line to report to work. Supervisor Matt Welsh[1] came out to the picket line and photographed the picketers. Welsh told the Center employees in the parking lot that "he wanted everybody to get back to work or else he was going to see that they were fired." Production manager Kristie Eagleson[2] came out to the workers who were waiting in the parking lot outside the picket line and gave them letters signed by Eagleson saying they were subject to discipline for not showing up to work because their absence was not "excused."

**Eagleson's statements to Ruddy.** Johnson delivered to Eagleson a copy of Local 370's collective bargaining agreement with the Flint Association of Plumbing and Mechanical Contractors the next day after the initial meeting. Eagleson said he asked if the collective bargaining agreement was negotiable and Johnson said no. Eagleson said he reviewed the contract and noticed that it covered some work that was assigned to the sheet metal workers and that it contained a clause saying that if the union gave better terms to any employer than those in the contract, all employers were entitled to the same terms. Eagleson said that the sheet metal workers representatives were telling his employees that the plumbers were not claiming sheet metal work, but that after reading the contract he concluded the plumbers were indeed claiming that work.

Patrick Ruddy, the union steward for the sheet metal workers' union, had picketed on behalf of the plumbers on August 6. Ruddy testified that the next day he spoke to Eagleson in Eagleson's office. Eagleson had Local 370's existing collective bargaining agreement in his hand and was reading parts of it aloud and explaining it to Ruddy. Eagleson said, "If we let the Plumbers come in here, it is going to take three or four of your men's positions. Who would you like to get rid of here?" Ruddy said Eagleson told him that the plumbers "do the same thing that we [the sheet metal workers] do." Eagleson offered Ruddy the contract and urged him to read it. A couple of days later,

---

[1] The name is also spelled "Welch" in the record; we have been unable to determine which spelling is correct.

[2] We will refer to Kristie Eagleson by first and last name in order to distinguish her from Robert Eagleson.

Eagleson repeated the same kind of remarks to Ruddy, "trying to impress on me the point that the Plumbers were going to take [our] jobs."

**Eagleson's conversation with Wayne Rose.** In mid-August, Center's licensed plumber, Wayne Rose, had his first conversation ever with Eagleson. On payday, supervisor Welsh told Rose he should go to Eagleson's office to pick up his pay check, instead of picking it up in Welsh's office as usual. When Rose went to Eagleson's office, Eagleson detained him for 45 minutes, telling him the history of the company, and in particular, how the company had resisted organization by the plumbers' union in 1994 and 1998. Eagleson told Rose he "eventually got rid of the sons of bitches." Rose said he asked whether Eagleson considered him useless, but Eagleson replied, "I hear you're a good one." When Rose told Eagleson he did not have health insurance, Eagleson said the company would provide it. Rose quoted Eagleson as saying: "[I]f you have any problems with this company, I'm the President. [Eagleson] said you need to discuss these with me, so."

**Rose's union t-shirt.** Rose bought a t-shirt with Local 370's insignia. Kristie Eagleson stopped him as he was leaving to go to a job and told him he must change shirts because she did not want contractors at the job to think that Center paid union wages. Center employees regularly wore t-shirts and other clothing with logos of various kinds. There was conflicting testimony about whether the company had a pre-existing, enforced rule limiting what clothes employees could wear to job sites, but Kristie Eagleson's version of the rule at the hearing was that employees could not wear anything offensive, religious, or political. She never said which of these categories the union insignia fell within.

**Rose's termination.** On Monday, September 22, Eagleson saw the company truck assigned to Rose on I-75 near Pierson Road at 6 p.m. The company's policy is that its trucks are only to be driven to the job and straight home, although there was disagreement among the witnesses at the hearing over whether it was permissible to do errands on the way. On Thursday of the same week, Welsh called Rose in and asked him about it.

Rose said that when Welsh asked him about why he was at I-75 and Pierson, he told Welsh he had stopped by the Local 370 office on the way home. Welsh said that it was "3, 5, 10 miles out of [Rose's] way." Rose cited instances where employees were allowed to do personal errands in a company truck. Welsh responded that Rose could no longer drive the company's truck. Rose said he told Welsh he would need a ride home and that he could not come to work the next day because his van needed a repair. Rose said Welsh told him to try to come in the next day. Rose said he called in that Friday and told a secretary that he could not get to work that day. Rose recounted that when he reported to work the next Monday, Welsh told him that he knew Rose was not happy at Center and Welsh would therefore accept Rose's resignation. Rose said he had not resigned, but Welsh insisted he did. The company then sent Rose a letter saying it accepted his voluntary resignation. Rose denies that he ever resigned.

Center contends that since Rose was working in Leonard, Michigan on Monday, he could not have been on his way home to Millington, Michigan. Center introduced a map into the record that shows that I-75 would have been more than ten miles out of his way. Welsh testified that when he told Rose he could not drive a company truck anymore, Rose blew up and said again and again, "[T]his is bullshit. I'm quitting." He said Rose was still saying it all the way out to the truck, and Kristie Eagleson also said that she heard Rose repeating these very words. Welsh said that Rose later called and wanted to take back his resignation, but that Welsh had not let him do so for two reasons: he knew Rose was "unhappy" working for Center and he had "performance issues" with Rose because of "numerous . . . code violations on some of the installations he had done."

**Eagleson's interview of David Lawrence.** David Lawrence applied for a job as a plumber at Center at the end of August 2003. He was interviewed by Eagleson, who asked him "how [he]

felt about the Union." Lawrence testified that he wanted the job, so he told Eagleson "what I thought he wanted to hear": "I told him that there's pros and cons to a union . . . ." Lawrence said Eagleson told him that if he wanted to join a union, Eagleson would put him in touch with the sheet metal workers' union (even though Lawrence was applying for a job as a plumber).

**The union members' job applications.** On August 17, Center ran a help-wanted ad for plumbers in the *Flint Journal*. The next day, Ranger first called to confirm that there were still openings, then he rounded up seven qualified union plumbers and they all went to apply for the jobs. The reception area at Center was very small and did not have chairs, so the men took their applications out to their trucks to fill them out. They turned in their applications, and the receptionist took the applications without any comment on whether the men had been inside or outside when they filled out the forms. Ranger copied the form and another group of union men brought in applications to Center on August 19, which the receptionist again accepted without comment. Three more union plumbers applied for jobs on October 2, and they filled out their applications in the reception area. Center never hired or even interviewed any of the union applicants. Instead, Center hired David Lawrence, Jeffrey Blasdell, Bradley Lidell, and Chance Crosno.

**Procedural history.** Local 370 filed unfair labor practices charges, and the Board's General Counsel filed a complaint alleging a long list of unfair labor practices based on the following allegations: (1) Welsh and Eagleson threatened to fire employees honoring the picket line, and Welsh took photographs of the picketers; (2) Eagleson threatened sheet metal workers that they would lose their jobs if the plumbers' union was elected to represent the plumbers; (3) Eagleson solicited grievances from employees during the organizing campaign; (4) Kristie Eagleson promulgated and enforced a rule prohibiting the wearing of union insignia; (5) Eagleson interrogated employees regarding their sentiments about unions; (6) Center refused to hire plumbers' union members who applied for jobs, even though the applicants were qualified for open jobs; and (7) Welsh fired Wayne Rose.

After a hearing, the ALJ found unfair labor practices on each allegation. Generally, where the testimony conflicted, the ALJ discredited the employer's witnesses, particularly Eagleson, and believed the union's witnesses. *Center Constr. Co.*, 345 N.L.R.B. No. 45, 2005 WL 2204524, at * 16, 20, 22, 23, 24 (Aug. 27, 2005).

The ALJ found that the number and quality of section 8(a)(1) violations made appropriate a *Gissel*[3] bargaining order. *Id.* at 37-39. The ALJ reasoned that firing for union activity is a "hallmark" violation; moreover, the effect of the violations was great because the bargaining unit was small and the violations were perpetrated by the highest management officials. *Id.* at 38. He found there was only "slight" possibility of correcting the effects of these violations by traditional remedies and an election. *Id.* at 39. The ALJ recommended that the company be ordered to recognize and bargain with the Union. *Id.* at 41.

The ALJ recommended that Wayne Rose be reinstated with backpay. *Id.* at 40. He also recommended that the company should be required to offer a job and backpay to one of the applicants wrongfully denied consideration on account of union affiliation. *Id.*

---

[3] Under *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 610-16 (1969), where an employer's unfair labor practices have made the holding of a fair election unlikely and have undermined the union's majority, the Board may order an employer to bargain without first requiring the union to show that it has been able to maintain majority status.

## II.  Board decision.

The Board unanimously agreed that the company committed unfair labor practices by threatening the employees for honoring the picket line, surveilling the picket line, interrogating David Lawrence during the job interview, prohibiting Rose from wearing the union t-shirt, firing Rose, and refusing to hire the union-affiliated job applicants. *Center Constr. Co.*, 345 NLRB No. 45, 2005 WL 2204524, at *1 (Aug. 27, 2005).  The Board further agreed that a *Gissel* bargaining order was appropriate. *Id.*  With one dissent, the Board affirmed the finding that Eagleson solicited grievances from Rose with the implied promise of remedying them.  *Id.*, at  *1-3.  Eagleson's instructions to bring problems directly to him varied from the company's established methods of dealing with employee grievances, and the entire conversation was remarkable because Rose and Eagleson had never had a conversation before the conversation during the organizing campaign. *Id.*, at *3.

However, the Board, with a dissent, rejected the ALJ's recommendation that Eagleson's conversation with Ruddy constituted an unfair labor practice.  It held that Eagleson's statement about needing to let three or four sheet metal workers go if Local 370 prevailed was a prediction based on the objective fact of Local 370's existing collective bargaining agreement. *Id.*, at *4.  The Board found Eagleson's statement was not coercive.  *Id.*

## III.  Standard of review.

We must uphold the factual findings of the Board if they are supported by substantial evidence on the record considered as a whole. *W.F. Bolin Co. v. NLRB*, 70 F.3d 863, 870 (6th Cir. 1995) (citing 29 U.S.C. §§ 160 (e) & (f) and *Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951)).  We defer to the Board, rather than to  the ALJ's findings of fact, but the ALJ's findings are part of the record that must be considered. *Id.*  We also review the Board's application of law to the facts under the substantial evidence standard. *Fluor Daniel, Inc. v. NLRB*, 332 F.3d 961, 967 (6th Cir. 2003).  We must accept the Board's credibility findings unless they have no rational basis. *Id.* We defer to the Board's interpretation of the National Labor Relations Act under the standard established in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *NLRB v. Webcor Packaging, Inc.*, 118 F.3d 1115, 1119 (6th Cir. 1997).  We review for abuse of discretion the Board's decision to issue a bargaining order rather than to order an election. *NLRB v. Gen. Fabrications Corp.*, 222 F.3d 218, 232 (6th Cir. 2000).

## IV.  Center Construction's petition for review.

Center contends that the Board's findings in numerous respects were not supported by substantial evidence, simply pointing to Center's own evidence and insisting that the ALJ and the Board should have accepted Center's evidence and rejected Local 370's evidence.  Center further argues that there was no basis for issuance of the *Gissel* order.  Center also contends that the Board held that Center should have recognized Local 370 based on the authorization cards alone, but the Board did not so hold, so we have no need to consider that argument.

**Picket line incidents.**  "It is well-settled Board law that absent proper justification, the photographing of employees engaged in protected concerted activities violates the Act because it has a tendency to intimidate." *Clock Elec., Inc. v. NLRB*, 162 F.3d 907, 917-18 (6th Cir. 1998) (internal quotation marks omitted).  Center contends that it was not coercive for Supervisor Welsh to take pictures of the picketers, because Center did not need pictures to tell it who was picketing. Center has to establish a justification for photographing the picketing, not establish that it could conduct reprisals even without the photographs.  No justification was shown.  Center also contends, "During the entire time picketing occurred at Center's facilities, none of Center's employees were seen or observed picketing."  This argument is mystifying, since Center concedes plumber Lance

Lockhart was picketing (although Center contends Lockhart was laid off at the time), and Patrick Ruddy, another Center employee, testified that he and other Center employees picketed.

Center also contends that Welsh's statements to the employees refusing to cross the picket line were not coercive, since all Welsh did was remind employees that Center had a mandatory policy of calling in to report absences. This version of events is contradicted by testimony that Welsh told the employees honoring the picket line that if they did not get to work, he would have them fired. The ALJ accepted the latter version of Welsh's statement, *Center Constr.*, 2005 WL 2204524, at *25, and the Board adopted his credibility findings. *Id.*, at *1, n.1. An employee who chooses to honor a protected primary strike by coworkers is engaging in protected concerted activity. *Savage Gateway Supermarket, Inc.*, 286 NLRB 180, 183 (1987), *enforced*, 865 F.2d 1269 (6th Cir. 1989) (mem.). Threatening to fire the employees for engaging in such protected activity violates section 8(a)(1) of the NLRA. *NLRB v. Difco Labs., Inc.*, 427 F.2d 170, 172 (6th Cir. 1970) (per curiam).

Center also contends that the letter it handed out to the employees who were honoring the picket line was only meant to remind them that they had to call in if they were not going to report to work that day. The ALJ found that the letter threatened to punish the employees for absence, without regard to whether the employees called in or not. *Center Constr.*, 2005 WL 2204524, at *25. This is a fair reading of the letter, and it supports the Board's conclusion that the letter violated the employees' rights to engage in concerted activity.

**Rose's t-shirt.** Wearing union insignia is part of an employee's right to engage in concerted activity, although the right is not absolute. *NLRB v. St. Francis Healthcare Centre*, 212 F.3d 945, 958 (6th Cir. 2000). An employer may restrict employees from wearing union insignia if the employer demonstrates special circumstances requiring the restriction. *Id.* Center contends that it was entitled to apply a longstanding clothing policy that had a business justification. The putative policy was to avoid wearing clothing with text or pictures that were offensive, religious, or political. Rose's t-shirt was not shown to be any of those things; therefore, it was not shown to fall within the putative rule. We uphold the Board's finding that the refusal to allow Rose to wear the union t-shirt was in violation of section 8(a)(1) of the NLRA.

**Solicitation of grievance.** "Under the Act, an employer cannot solicit grievances from employees during a union organizing campaign with the express or implied suggestion that the problems will be resolved if the union is turned away." *NLRB v. V&S Schuler Eng'g, Inc.*, 309 F.3d 362, 370 (6th Cir. 2002). Where an employer institutes a new practice of soliciting grievances during an organizational campaign, an inference arises that the employer is implicitly representing to the employees that their complaints will be addressed without the need for the union. *Id.* Center contends the Board erred in finding Eagleson solicited grievances from Rose, thereby impliedly promising to remedy them. The Board found that before the organizing campaign, Eagleson had never even spoken with Rose, much less discussed grievances with him. *Center Constr.*, 2005 WL 2204524, at *2. Before the organizing campaign, employees were required to present grievances to their supervisor first; during the campaign, Eagleson told Rose if he had any problems, he should come directly to Eagleson, the president of the company. *Id.* Center's attack on the Board's ruling boils down to a disagreement with the Board's finding that Eagleson deviated from the company's usual policy of how to handle employee grievances. The Board's finding is supported by substantial evidence.

**Rose's Termination.** Center contends that the Board erred in not accepting its evidence that Rose voluntarily quit and in concluding that Rose was fired for engaging in union activity.

Firing an employee because he has engaged in union activity is an unfair labor practice under sections 8(a)(1) and 8(a)(3) of the NLRA. Under the *Wright Line*, 251 NLRB 1083 (1980), test

approved by the Supreme Court in *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 404 (1983), *overruled on other grounds*, *Director, Office of Workers' Comp. Programs v. Greenwich Collieries*, 512 U.S. 267, 276-78 (1994), to prove an employee was fired because of anti-union animus, the NLRB's General Counsel bears the burden of establishing a prima facie case of discrimination. The elements are: (1) the employee was engaged in protected activity; (2) the employer knew of the protected activity; and (3) the employee's protected activity motivated the adverse treatment. *Temp-Masters, Inc. v. NLRB*, 460 F.3d 684, 689 (6th Cir. 2006). Anti-union motivation can be proved by circumstantial evidence. *Id.* If the Board establishes that anti-union animus was a motivating factor in the employer's decision to fire the employee, the burden of persuasion switches to the employer to prove that it would have made the same employment decision regardless of the employee's union activity. *Id.* If the employer's proffered justification for the decision is determined to be pretextual, the Board is not obligated to consider whether the employer would have taken the same decision regardless of the employee's union activity. *Id.* at 693.

Center Construction does not contend that it fired Rose because of driving the company truck out of his way, but instead insists that Rose quit and that Welsh then refused to allow him to withdraw his resignation. All of Center's arguments on this point depend on our accepting its version of the facts, which we may not do. The ALJ found Rose's story credible and Welsh's story incredible, and consequently concluded that Rose did not quit, but that Welsh pretended Rose had quit so that Center could be rid of him. *Center Constr.*, 2005 WL 2204524, at *37. The ALJ found that the claim that Rose quit was pretextual, as was Center's claim that Welsh decided not to let Rose withdraw his resignation because (1) Welsh thought he was "unhappy" and (2) Welsh was not satisfied with Rose's work. *Id.*, at *37. The Board adopted the ALJ's credibility determinations. *Id.*, at *1, n.1. Center contends that it was irrational to accept Rose's testimony as truthful because Rose denied receiving a letter which Center contends it has proven beyond doubt that he received. Eagleson testified that when Rose resigned, Center mailed him a letter acknowledging his resignation, together with a paycheck. Center now contends that since Rose never complained that he did not receive his check, he must have received the letter. The letter in the record does not say that a check was enclosed. The ALJ was not compelled to accept Eagleson's statement on this point, and in any case, the point is peripheral and would not necessarily govern the ALJ's findings on the decisive question of whether Rose quit or was fired. The ALJ's findings were a permissible interpretation of the record. On the version of the facts accepted by the ALJ, there was ample evidence to support the conclusion that Rose was fired because of his union activity.

**Eagleson's interview with Lawrence.** An employer violates section 8(a)(1) of the NLRA when it interrogates employees about their union activities under circumstances in which the interrogation reasonably tends to restrain, coerce, or interfere with the employees' rights under the NLRA. *V&S ProGalv, Inc. v. NLRB*, 168 F.3d 270, 280 (6th Cir. 1999). The Board assesses coerciveness in light of, among other things, the background, the nature of the information sought, the questioner's identity, and the place and method of interrogation. *See id.* Center contends the Board erred in finding Eagleson interrogated David Lawrence about whether he was pro-union. Again, Center relies on its version of the testimony, Eagleson's account of the conversation, in which he did not interrogate Lawrence, instead of the testimony the ALJ credited, that of David Lawrence. *Center Constr.*, 2005 WL 2204524, at *32. The Board's finding is supported by substantial evidence.

**The union members' job applications.** Center contends that the Board erred in finding that it discriminated against the union job applicants based on their union affiliation. An employer violates section 8(a)(3) of the NLRA when it refuses to hire job applicants because of their union affiliation. *Fluor Daniel, Inc. v. NLRB*, 332 F.3d 961, 968 (6th Cir. 2003). The Board's General Counsel bears the burden of proving that the positions for which the applicants applied were actually

open and that the applicants were qualified for the positions.[4] *Id.* Once the General Counsel makes a prima facie case, the employer may prove that it would not have hired the applicants even if they had not been affiliated with the union. *Id.* Center does not dispute that the General Counsel proved a prima facie case, but contends that it had legitimate, non-discriminatory reasons for not hiring the union applicants and for preferring the people it hired instead. The ALJ discredited these arguments, specifically finding that the applications of the people hired had many of the defects Center alleges in the union men's applications, that those hired had no advantage that was not also common to at least some of the union men, and that two of the union men were more qualified than those hired. The Board's finding of pretext and thus discrimination was supported by substantial evidence.

**The *Gissel* bargaining order.** Center contends that the circumstances in this case did not justify entering a bargaining order under *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 610-16 (1969). In *Gissel*, the Supreme Court held that where an employer's outrageous and pervasive unfair labor practices render a fair election impossible, the Board can simply order the employer to bargain with the union. *Id.* at 613-14. Moreover, even where the employer's actions do not rise to the level of outrageousness, it lies within the Board's discretion to issue a bargaining order where (1) the union at one time had authorization cards from a majority of the employees in the unit, obtained without unfair practices or misrepresentations, and had requested bargaining, (2) the employer's unfair labor practices have significantly dissipated the union's majority, and (3) a fair election cannot be had under all the circumstances. *Gissel*, 395 U.S. at 614-15; *Indiana Cal-Pro, Inc. v. NLRB*, 863 F.2d 1292, 1300 (6th Cir. 1988). The Board should not issue a bargaining order if the employer has committed only minor or limited unfair labor practices that would have only a minimal effect on the fairness of an election. *NLRB v. Gen. Fabrications Corp.*, 222 F.3d 218, 232 (6th Cir. 2000).

It is undisputed that Local 370 had authorization cards from both the employees in the bargaining unit. The Board in this case adopted the recommendations of the ALJ, who found that Center had committed a series of unfair labor practices, including a "hallmark" violation in firing Rose; that Rose was fifty percent of the bargaining unit; that the misconduct was committed by the highest company officials; that Eagleson interrogated one of the replacement plumbers about his union sentiments before hiring him; and that the effect of these incidents would make it unlikely that the conditions prior to the unfair labor practices could be restored by other remedies. *Center Constr.*, 2005 WL 2204524, at *38-39.

Center relies on its arguments, rejected above, that it did not commit the string of unfair labor practices found by the ALJ and Board. Since the individual arguments failed, so should the cumulative argument.

Center also contends that the unfair practices were not serious or pervasive enough to warrant issuance of a bargaining order. To the contrary, the firing of a union activist is a "hallmark" violation, *see Gen. Fabrications Corp.*, 222 F.3d at 233, especially when that employee represents half the bargaining unit, *see id.* at 234 (small size of unit exacerbates effect of unfair labor practices). Center was also found to have refused to hire union members in violation of the NLRA; interrogated a potential hire regarding his union sentiments; solicited employee grievances; surveilled employees engaged in protected activity; threatened co-workers honoring a picket line; and forbidden the display of the union insignia. The number, gravity, and type of the unfair labor practices, together with the small size of the bargaining unit and the involvement of highest management, support the Board's conclusions that Center dissipated Local 370's majority and that a fair election would be

---

[4] Although sixteen union members applied for jobs, the ALJ found that the General Counsel only proved that twelve of them were qualified, *Center Constr.*, 2005 WL 2204524, at *33; the ALJ only recommended including those twelve applicants in the remedial order, *id.*, at *44, and the Board's order accepted the ALJ's recommendation, *id.*, at *6.

unlikely. *See id.* at 233-34. The Board's decision to issue a bargaining order, rather than ordering an election, was not an abuse of discretion. *See id.*

### V.  Local 370's petition for review.

The Board rejected the ALJ's recommendation in only one respect: the Board held that section 8(c) of the NLRA protected Eagleson's statements to Ruddy that the plumbers' collective bargaining agreement would cause the loss of three or four sheet metal worker jobs. *Center Constr. Co.*, 345 NLRB No. 45, 2005 WL 2204524, at * 3-6 (Aug. 27, 2005). Though Eagleson himself denied making such a statement, the Board did not reject the ALJ's adverse determination of Eagleson's credibility; instead, the Board found that the statement was in fact made, but that it was based on objective fact. *Id.*, at *4. Member Liebman dissented on this point. *Id.*, at *8-11. Local 370 petitions for review of the holding that Eagleson's statement was based on objective fact.

An employer violates section 8(a)(1) by threatening employees with loss of jobs to coerce them into relinquishing their rights to concerted activity. *See NLRB v. Okun Bros. Shoe Store, Inc.*, 825 F.2d 102, 105-08 (6th Cir. 1987). However, section 8(c) of the NLRA provides that the expression of views, argument, or opinion is not an unfair labor practice if it contains "no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969), interpreted section 8(c) to mean that an employer may

> make a prediction as to the precise effects he believes unionization will have on his company. In such a case, however, the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control or to convey a management decision already arrived at to close the plant in case of unionization.

The Board here held that Eagleson's reliance on the Local 370's existing collective bargaining contract with other employers and his making that contract available for Ruddy to look at meant that Eagleson made a permissible prediction, not a forbidden threat. *Center Constr.*, 2005 WL 2204524, at *3.

An employer predicting adverse consequences of unionization does not have to prove the truth of his assertions, but his statements must have the support of "precise objective facts." *ITT Automotive v. NLRB*, 188 F.3d 375, 386 n.8 (6th Cir. 1999). Since Eagleson himself denied telling any of his employees that jobs would be lost,[5] we are in the anomalous position of searching for objective facts to validate a statement the speaker denied making. It is of crucial importance that the Board accepted the ALJ's rulings, findings, and conclusions, except as modified in the Board's order, *see Center Constr.*, 2005 WL 2204524, at *1, n.1.

Where the Board differed from the ALJ was in failing to take into account the surrounding circumstances that made Eagleson's statements misleading. In determining whether Center's statements were coercive, the ALJ considered the facts in the context in which they occurred, *see NLRB v. E.I. duPont de Nemours*, 750 F.2d 524, 528 (6th Cir. 1984), whereas the Board looked only at the particular conversation at issue. Specifically, the ALJ looked at the conversation in light of two other facts: (1) The plumbers' union sought only to represent two employees, who were plumbers, not HVAC workers, as Eagleson knew from looking at the two authorization cards; and (2) Eagleson knew that Ranger's letter of August 5, referring to representing HVAC employees, was a mistake and Eagleson was "not confused" about the fact that the plumbers actually only sought to

---

[5] Q: "Did you indicate or tell any of your employees that there would be a reduction in the number of Sheet Metal Workers employed, if the Plumbers' Union represented some of your employees?'  A: "No."

represent the two plumbing employees, rather than the HVAC employees. *Center Constr.*, 2005 WL 2204524, at \*28. The ALJ had previously found that (1) when the sheet metal workers (who represented most of Center's labor force) had honored the plumbers' picket line, Center had threatened to fire them, *id.*, at \*17; and (2) Eagleson told Ranger and Johnson he would never sign a contract with Local 370, and he requested a copy of the agreement only "to further his efforts to drive a wedge between Local 370 and the Sheet Metal Workers," *id.*, at \*17. With this background, the ALJ found that Eagleson's statement to Ruddy about losing three to four sheet metal jobs was "intended to provoke a clash between the Sheet Metal Workers Union and Local 370, and his threat to Ruddy is consistent with that intent." *Id.* at 29.

The Board argues that Eagleson's statements consisted of objective facts, which could be ascertained by looking at Local 370's existing collective bargaining contract. The jurisdictional provision of the collective bargaining contract with the Flint Association of Plumbing & Mechanical Contractors, Inc. did include some work that appears to be HVAC work, but the terms of that particular contract would not be binding on Center unless Center agreed to it; thus, Eagleson's prediction was based on future events partially within Center's control. Moreover, Ranger specifically disavowed any intent to cover the HVAC workers, which shows that the plumbers were not seeking the same jurisdictional scope described in the contract that Eagleson was relying on. The ALJ found Eagleson was involved in a disingenuous attempt to convince the sheet metal workers of a jurisdictional grab that he knew was not real. *Id.*, at 15\* ("Eagleson tried to exploit what he knew was an inadvertent mistake in order to drive a wedge between Local 370 and the Sheet Metal Workers Union."). A misleading statement is not based on "objective fact." *See NLRB v. Pentre Elec., Inc.*, 998 F.2d 363, 371 (6th Cir. 1993) ("Of course, the basis for an employer's statements must be truthful for the statement to receive the protection of section 8(c)."), *overruled on other grounds by Holly Farms Corp. v. NLRB*, 517 U.S. 392, 409 (1996). The Board's ultimate finding that Eagleson's assertion was based on objective facts cannot be squared with the ALJ's other findings, which were affirmed, and which showed Eagleson was attempting to mislead the sheet metal workers into thinking a jurisdictional dispute threatened their jobs, when in fact he knew there was no such dispute. The Board's finding that this statement came within the protection of section 8(c) is not supported by substantial evidence on the record as a whole.

Accordingly, we must grant Local 370's petition for review of this aspect of the Board's order.

In sum, we grant the Board's petition to enforce except insofar as the Board's order holds that Eagleson's statement about loss of sheet metal jobs was not an unfair labor practice; we deny Center Construction's petition to review; and we grant Local 370's petition to review.

---

**CONCURRING IN PART, DISSENTING IN PART**

---

ROGERS, Circuit Judge, concurring in part and dissenting in part.  With respect, it is not our job to second-guess the labor policy determinations of the National Labor Relations Board.  Yet in my view that is what we are doing by taking sides in an intra-Board dispute on an issue that is essentially one of labor policy rather than one of fact or pure law.  I therefore dissent from the reversal of the Board's determination that the employer's prediction of consequences was not an unfair labor practice in this case.  I concur in the remainder of the majority opinion.

The Board in this case ruled in most respects in favor of the Union.  It held that threatening the employees for honoring the picket line, surveilling the picket line, interrogating David Lawrence, prohibiting Rose from wearing the union t-shirt, firing Rose, and refusing to hire the union-affiliated job applicants amounted to unfair labor practices in this case.  On the claim that the employer's prediction of consequences amounted to a threat, however, the Board reasoned as follows:

> Eagleson's statement to the Sheet Metal Workers Union shop steward represented his understanding of the collective-bargaining agreement that the Plumbers Union wanted the Respondent to sign.  In expressing his opinion, he repeatedly quoted from the agreement and made it clear that he was relying upon the language of the proposed agreement as the basis for his opinion.

To be sure, Member Liebman dissented, reasoning that Eagleson's statements were "neither based on objective fact, nor did they address consequences beyond Respondent's control."

If, as Board members, we would agree with Member Liebman, that alone is insufficient to warrant reversal in this case.  It is the majority of the Board that has power within our system to set labor policy, and it is for reviewing courts to reverse only if there is not substantial evidence to support the facts found by the Board majority, *Allentown Mack Sales and Serv. v. NLRB*, 522 U.S. 359, 366-67 (1998), or if there is not substantial evidence to support the Board's application of law to particular facts, *Turnbull Cone Baking Co. of Tenn. v. NLRB*, 778 F.2d 292, 295 (6th Cir. 1985).  Finally, the Board's interpretation of the National Labor Relations Act is entitled to *Chevron* deference and its reading of the statute need only be reasonable.  *FiveCAP, Inc. v. NLRB*, 294 F.3d 768, 776 (6th Cir. 2002).

First, there is no real factual dispute as to what Eagleson said; the record is clear that Eagleson said to Ruddy that, "If we let the Plumbers come in here, it is going to take three or four of your men's positions.  Who would [you] like to get rid of here?"  There may be a dispute as to what the underlying motivation of the statement was, or how the statement was perceived, but these are the type of facts or inferences for which deference to agency expertise is most warranted, notwithstanding a contrary determination by the ALJ, even if this court would have decided the issue differently in the first instance.  *Id.* at 776.  As Judge Frank cogently explained on remand from the Supreme Court in *Universal Camera*, a case like this one in which the Board came to a factual conclusion different from that of the hearing examiner (as ALJs were then called):

> An examiner's finding binds the Board only to the extent that it is a 'testimonial inference,' or 'primary inference,' i.e., an inference that a fact to which a witness orally testified is an actual fact because that witness so testified and because observation of the witness induces a belief in that testimony.  The Board, however, is not bound by the examiner's 'secondary inferences,' or 'derivative inferences,' i.e., facts to which no witness orally testified but which the examiner inferred from

> facts orally testified by witnesses whom the examiner believed.  The Board may reach its own 'secondary inferences,'  and we must abide by them unless they are irrational; in that way, the Board differs from a trial judge (in a juryless case) who hears and sees the witnesses, for, although we are usually bound by his 'testimonial inferences,' we need not accept his 'secondary inferences' even if rational, but, where other rational 'secondary inferences' are possible, we may substitute our own.

*NLRB v. Universal Camera Corp.*, 190 F.2d 429, 432 (2d Cir. 1951) (Frank, J., concurring) (footnotes omitted).

In particular, reversal is not required because the Board's analysis of the facts focused on the particular conversation at issue, while the ALJ looked at the "broader context." Maj. Op. at 10.  The Board gets to focus where it wants, as long as there is substantial evidence to support its conclusions.  Our deference is accorded to the Board and not the ALJ.  *W.F. Bolin Co. v. NLRB*, 70 F.3d 863, 870 (6th Cir. 1995).  Furthermore, the Board majority explicitly acknowledged that the test under § 8(a)(1) requires an examination of the totality of the circumstances and concluded that Eagleson's statements were not coercive under this standard.  Thus, the Board cannot be faulted for failing to consider the context in which the statements were made, especially in light of the fact that the Board's opinion as a whole establishes that the Board was well aware of the context.

Second, the Board made no determination in contravention of the NLRA, or court precedent.  The only suggested legal basis for reversal of the Board in this case, apart from the general obligation not coercively to threaten job loss, is the requirement that employer predictions of adverse consequences of unionization be based on "precise objective facts."  *ITT Auto. v. NLRB*, 188 F.3d 375 (6th Cir. 1999).  The Board's conclusion that Eagleson's statements were protected (that is, based on "precise objective facts") is supported by the record.  In *ITT Automotive*, it should be noted, we upheld rather than reversed the Board's determination regarding coercion.  We summarized the law in this area in *ITT Automotive* as follows:

> In balancing the employer's . . . right to free expression against the employee's right to free association, the Supreme Court has observed that:

>> [A]n employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union. . . . He may even make a prediction as to the precise effects he believes unionization will have on his company. In such a case however, the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control. . . . If there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him, the statement is no longer a prediction based on available facts but a threat of retaliation based on misrepresentation and coercion.

> *Gissel Packing*, 395 U.S. at 618, 89 S.Ct. 1918.  Under *Gissel Packing*, an employer may claim the protections of § 8(c) as a defense to an unfair labor practice charge of unlawful coercion in violation of § 8(a)(1).  *See, e.g.*, *NLRB v. Pentre Elec.*, 998 F.2d 363, 368-69 (6th Cir.1993).  Indeed, "'it is often difficult in practice to distinguish between lawful advocacy and threats of retaliation'" when an employer seeks to point out to workers the adverse consequences of unionization during a representation election. *Id.* at 369 (quoting *NLRB v. Village IX, Inc.*, 723 F.2d 1360, 1367 (7th Cir. 1983)).

*ITT Auto.*, 188 F.3d at 385.  Indeed, the very difficulty that we identified in *ITT Automotive* compels our deference in this case—the Board's expertise and competence lie in judging the effects of employer speech in the context of the employment relationship.  *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 620 (1969).  The Board's conclusion in this case that Eagleson's statements did not rise to the level of threats or intimidation is supported by such evidence that "a reasonable mind might accept as adequate."  *ITT Auto.*, 188 F.3d at 384.

If the dissenting Board member's position had carried the day before the Board, that determination would warrant deference, just as we uphold the other determinations in favor of the Union in this case.  But the law requires us to uphold the decisions of the Board majority, if consistent with the law and supported by substantial evidence.  I therefore respectfully dissent from Part V of the majority opinion.